UNITED STATES of America,
Plaintiff–Appellee,

v.

David Michael STEINBERG,
Defendant–Appellant.

No. 94–50542.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 5, 1996.

Decided Oct. 30, 1996.

Jonathan D. Soglin, Oakland, CA, for defendant-appellant.

Ronald L. Cheng, Assistant United States Attorney, Los Angeles, CA, for plaintiff-appellee.

Before: PREGERSON and T.G. NELSON, Circuit Judges, and LYNCH,* District Judge.

* Honorable Eugene F. Lynch, United States District Judge for the Northern District of California, sitting by designation.

T.G. NELSON, Circuit Judge:

## OVERVIEW

Defendant David Michael Steinberg was convicted of (1) conspiracy to possess cocaine with intent to distribute (count one); (2) using or carrying a firearm during a drug trafficking crime (count two); (3) conspiracy to possess and transfer counterfeit currency (count three); (4) possession of counterfeit federal reserve notes (count four); and (5) transferring counterfeit federal reserve notes (count 5). After the jury convicted Steinberg, but prior to sentencing, Steinberg made a motion for a new trial based on the Government's failure timely to disclose exculpatory evidence. The district court denied defendant Steinberg's motion for a new trial and sentenced Steinberg to 248 months' incarceration. Steinberg timely appeals. We have jurisdiction under 28 U.S.C. § 1291, and we reverse his convictions under counts one and two of the indictment and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

In September 1992, Craig Rickard introduced defendant Steinberg to confidential informant Martin James Schulz. Schulz testified at trial that at a meeting with defendant Steinberg, he and Steinberg discussed a possible purchase of ten kilograms of cocaine with counterfeit currency. Schulz testified that he and the defendant anticipated that the cocaine would be divided in the following manner: six kilograms for Steinberg and four for Schulz. The uneven division of 60/40 (rather than the usual 50/50) was to compensate defendant Steinberg for a debt that was owed to him by informant Schulz. Defendant's role in the deal was to provide the counterfeit money.

During the month of September, defendant and Schulz continued to discuss the transaction over the telephone in a series of recorded conversations. Cocaine was never actually mentioned in these recorded conversations. On September 14, 1992, defendant and Schulz discussed the transaction, and upon Schulz's request, defendant agreed to provide Schulz with a sample of the counterfeit currency.

On September 16, 1992, Schulz and defendant spoke again in a recorded conversation. Defendant told Schulz: "I jack people." Informant Schulz testified at trial that he believed this meant that defendant either robs people for drugs or uses counterfeit money to buy drugs. On the tape, Schulz told defendant that the price was "$17.50." At trial, Schulz testified that this meant $17,500 per kilo of cocaine. Finally, on the tape, Schulz asked defendant if he could "get rid of those," which Schulz testified referred to Schulz's share of the cocaine.

On September 21, 1992, defendant gave Schulz two $100 bills as a sample of the counterfeit. On September 28, defendant and Schulz met to finalize plans for the transaction. At one point during the conversation, defendant stated, "You're not taking off with the packs." Schulz testified that he thought "packs" meant "kilos" and that defendant offered to purchase Schulz's share.

Ethan Siegel, a friend of defendant's, testified that on the evening of September 28, 1992, defendant called him and asked him to return some counterfeit currency that Siegel had in his house. When Siegel returned the money that evening, defendant told Siegel that he might need Siegel's help the next day and asked Siegel if he could borrow some guns.

On September 29, 1992, defendant contacted Siegel and asked Siegel to accompany him and to "make sure" to bring the guns. Siegel brought two guns with him when he went to meet defendant. When Siegel arrived at defendant's residence, he gave one of the guns to defendant. Defendant and Siegel then got into a van and drove to meet informant Schulz. Siegel drove the van, while defendant rode in the front passenger seat.

Siegel testified that during the drive to meet Schulz, defendant told Siegel that Schulz had arranged a ten-kilogram cocaine deal to compensate Steinberg for the money that Schulz had lost. Siegel also testified that defendant told him that he would sell the cocaine in Hawaii because of the better prices available there.

Defendant and Siegel met informant Schulz in a nearby parking lot. A duffle bag containing counterfeit currency was placed in Schulz's car. Schulz then drove away from the parking lot to the "transaction site." Defendant and Siegel followed Schulz in the van.

Schulz drove to the "transaction site" and met his "supplier," another confidential informant. Informant Schulz gave the other informant the duffel bag containing the counterfeit currency, and the informant gave Schulz the keys to a rental car containing ten kilograms of cocaine. While informant Schulz and the "supplier" were making this exchange, defendant and Siegel drove ahead a short distance to wait for the transaction to be completed.

As informant Schulz walked toward the rental car containing the cocaine, law enforcement officers arrested defendant and Siegel. At the time of the arrest, defendant was in the front passenger seat of the van and Siegel was in the driver's seat. Two loaded handguns were found on the floor of the van. One of the handguns was on the floorboard on the driver's side and the other was underneath the passenger seat.

Defendant was convicted after a jury trial of: (1) conspiracy to possess more than five kilograms of cocaine, in violation of 21 U.S.C. § 846 (count one); (2) using or carrying a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) (count two); (3) conspiracy to possess and transfer counterfeit currency, in violation of 18 U.S.C. § 371 (count three); (4) possession of counterfeit currency, in violation of 18 U.S.C. § 472 (count four); and (5) transfer of counterfeit federal reserve notes, in violation of 18 U.S.C. § 473 (count five).

On March 19, 1994, nine months after the trial and eighteen months after defendant's arrest, the Government turned reports over to defendant's counsel concerning separate investigations involving counterfeit currency that had been traced back to informant Schulz, the Government's key witness. This evidence revealed that Schulz had been involved in two different illegal transactions involving counterfeit currency around the time that he was acting as a confidential

informant for the Government in the present case. This evidence also revealed that Government agents were aware that Schulz owed some money to defendant. Based on this evidence, defendant moved for a new trial. The district court denied the motion.

On September 19, 1994, the district court sentenced defendant to, among other things, 248 months of incarceration. Defendant timely appeals.

## ANALYSIS

### A. Denial of New Trial Motion

#### 1. Standard of Review

A district court's denial of a new trial motion based on an alleged *Brady* violation is reviewed *de novo*. *United States v. Zuno–Arce*, 44 F.3d 1420, 1425 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995).

#### 2. Discussion

Defendant claims that the Government failed timely to disclose exculpatory evidence and that under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), a new trial is required. We agree.

■ In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment...." *Id.* at 87, 83 S.Ct. at 1196–97. To prove that the Government has violated *Brady*, the defendant Steinberg must show (1) that the material was exculpatory; (2) that the exculpatory material was not produced when it should have been; and (3) that the failure timely to produce the exculpatory material "mattered." *Zuno–Arce*, 44 F.3d at 1425.

The Government concedes that the evidence that informant Schulz had been involved in two different illegal transactions involving counterfeit currency around the time that he was acting as a confidential informant in the case against defendant was exculpatory and that it was not produced when it should have been. Thus, the only

question for us to determine is whether the failure timely to produce the material "mattered," i.e., whether the evidence was "material."

■ The standard for determining materiality of a *Brady* violation depends on the circumstances surrounding the violation. "[I]f the prosecution knowingly uses perjured testimony, or if the prosecution knowingly fails to disclose that testimony used to convict a defendant was false, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury verdict." *United States v. Endicott*, 869 F.2d 452, 455 (9th Cir.1989). "On the other hand, in the absence of the prosecution's knowing use of perjury, new evidence is material under the *Brady* standard, warranting a new trial, only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*

It is uncontroverted that the prosecutor knew nothing about the exculpatory material until nine months after the trial. However, defendant argues that because the Government's investigating agents knew about the exculpatory material, this knowledge was imputed to the prosecutor. Thus, defendant claims that the prosecutor knowingly used false testimony. We reject this claim, in part, and need not resolve the issue as to the balance of the claims.

Defendant argues that the prosecutor knowingly used false testimony because Government witnesses testified to at least three things that Detective Kurt Rothschiller and Agent Doug Carver [1] must have known were false: (1) informant Schulz's testimony that he asked defendant for a sample of counterfeit bills; (2) Schulz's testimony that he didn't know what happened to the money that was owed to defendant; and (3) Detective Rothschiller's testimony that he was unaware that Schulz was engaging in continuing criminal activity. We reject defendant's first two claims of knowing use.

■ First, informant Schulz's testimony about what he told the defendant regarding the need for a sample of counterfeit bills is not perjured testimony. At trial, Schulz testified that he asked defendant for a sample of the counterfeit bills. Schulz testified that he told defendant that he wanted a sample so that he could "see if they looked real enough or not." Defendant claims that this testimony was false because Schulz had been involved in other transactions in which he handled the same counterfeit notes which were involved in this case and thus, "Schulz was lying when he testified that he gave [defendant] the impression that he wanted a sample for himself. . . ." Defendant is misled.

Schulz testified that he told defendant that he wanted the samples to see if they looked real enough or not. The fact that Schulz may have been lying to defendant when he said that he wanted to check out the quality of the bills is irrelevant. What matters is whether Schulz actually did as he testified: Did he tell the defendant that he wanted the bills to check out the quality? Defendant does not claim that this is not what Schulz actually said to him, and thus, his claim that this was perjured testimony is not supported.

■ Second, there is insufficient evidence to support a finding that Carver and Detective Rothschiller knew that informant Schulz was not testifying truthfully regarding what had happened to the money owed to defendant, and who owed the money. At trial, when asked about who owed the debt to defendant, informant Schulz testified that Craig Rickard owed Steinberg "the money for counterfeit money that he had lost or kept. I don't know exactly what he did with it."

Defendant claims that this was perjured testimony because the "new evidence shows that Carver and Detective Rothschiller knew that informant Schulz knew very well what happened to the money: he lost it himself." Defendant provides no cite to the record, and this court has found no evidence to support the claim that Carver and Detective Roth-

---

**1.** Agent Carver and Detective Rothschiller were the case agents that sat with the prosecutor during the trial. Agent Carver admitted that he knew of the exculpatory material at the time of the trial.

schiller knew that informant Schulz had lost the money himself and that either Carver or Detective Rothschiller knew that Rickard did not owe a debt to defendant. This claim also lacks support in the record.

Finally, we need not decide if Agent Carver's knowledge of informant Schulz's criminal activities rendered false Detective Rothschiller's testimony that he knew nothing about criminal activities by informant Schulz. Even if we were to hold that Detective Rothschiller's testimony was not false, we still believe that reversal is required in this case. As noted above, the Government concedes that the withheld evidence was both exculpatory and untimely disclosed. To reverse under the stricter standard for materiality, we must find that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding *would* have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (emphasis added).

"A 'reasonable probability' of a different result is [ ] shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, —— U.S. ——, ——, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381). This test, however, "is not a sufficiency of the evidence test." *Id.* As the Supreme Court explained:

> A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Id.*

■ In the present case, defendant claims that the withheld evidence was material because it "revealed Schulz to be untrustworthy and because it did so in a trial where Schulz's testimony was critical." Although the question is a close one, we hold that the withheld evidence undermines confidence in the verdict.

Even though informant Schulz's credibility was explored at trial through questions relating to the plea agreement that Schulz had made with the Government, the jurors may have been less likely to believe Schulz's testimony had they known about the withheld evidence. The withheld evidence showed that Schulz was engaged in ongoing criminal activities during the time that he was acting as a Government informant in the present case. The withheld evidence also showed that Schulz owed defendant some money, giving him a motive to lie to get Steinberg locked up.

Furthermore, there was little to corroborate Schulz's testimony that Steinberg agreed to purchase cocaine. Although Siegel testified that defendant told him that the deal with informant Schulz involved cocaine and that Steinberg planned on selling the cocaine in Hawaii, the actual evidence seized at the time of arrest was consistent with a counterfeit-for-cash transaction but less consistent with a counterfeit-for-drug transaction, as discussed below.

This lack of corroboration is important for several reasons. First, the whole theory of defense relied on convincing the jury that defendant agreed to exchange the counterfeit money for cash and that he did not intend to exchange the counterfeit money for cocaine.

Second, Schulz's plea bargain required that Schulz assist the Government in narcotics transactions involving five or more kilograms of cocaine. If the quantity of cocaine were less or if the deal did not involve narcotics, he would not receive the benefits of the plea bargain agreement.

Third, during the monitored conversations between defendant and Schulz, there was not a single mention of "cocaine." Although Schulz testified that some of the words used in the monitored conversations related to the purchase of cocaine, a Secret Service Agent (SSA) testified to contrary meanings. For example, Schulz testified that the use of the

word "packs" was code for kilos of cocaine; the SSA testified that counterfeiters put fake money in "bundles" or "packages" or "packs" of equal amounts. Another example is informant Schulz's use of $17.50 as the price in one of the recorded conversations with defendant Steinberg. Schulz testified that this meant $17,500 for a kilogram of cocaine; the SSA testified that the going price for counterfeit money was between 10 and 20 percent of face value; $17.50 is in that range since the negotiations were about counterfeit $100 bills.

A final example of the lack of corroboration is the amount of money actually seized by the Government. The Government seized $171,400 in counterfeit currency after the transaction. At the rate of $17.50 per $100, the return would be $29,995, just $5 shy of a round number of $30,000. On the other hand, if defendant thought he was buying 10 kilograms of cocaine at the price of $17,500 per kilogram, he would have been $3,600 short of the needed $175,000. It does not make sense that he would show up for a drug deal $3,600 short of the total amount needed.

To meet the "reasonable probability" standard, defendant does not need to demonstrate that, after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough evidence left to convict him. *Kyles*, —— U.S. at ——, 115 S.Ct. at 1566. He need only show that the "evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* Defendant has met this burden.

Informant Schulz was the Government's key witness in the trial. Thus, his credibility as a witness was an important issue in the case. Evidence that he was engaged in ongoing criminal activity and owed the defendant money was relevant to his credibility, and the defendant was entitled to have the jury know about it. *See United States v. Brumel–Alvarez,* 991 F.2d 1452, 1463 (9th Cir.1992).

We hold that there is a reasonable probability that, had the evidence been timely disclosed to the defense, the result of the proceeding would have been different. *See Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383–

84. Therefore, we reverse the defendant's conviction on count one of the indictment and remand for a new trial.

### B. Outrageous Government Conduct

Defendant claims that this court should exercise its supervisory powers to dismiss the indictment as a sanction for the Government's misconduct in failing to timely disclose the *Brady* material. We are not persuaded.

 The mere failure to disclose evidence that affects the credibility of a key witness is not "so grossly shocking and so outrageous as to violate the universal sense of justice." *See United States v. Restrepo,* 930 F.2d 705, 712 (9th Cir.1991) (quotations omitted). We hold that the misconduct here does not rise to a level that requires dismissal of the indictment. *See id.*

### C. Admission of Evidence

Defendant claims that the district court erred in admitting Siegel's testimony regarding prior conduct of the defendant involving drugs and counterfeit currency. We reject this claim.

#### 1. Standard of Review

A district court's evidentiary rulings are reviewed for an abuse of discretion. *United States v. Manning,* 56 F.3d 1188, 1196 (9th Cir.1995).

#### 2. Discussion

Siegel testified at trial that he and defendant had previously passed bills in bars and restaurants to test the bills' "passability." These bills were the same type of counterfeit that defendant was on trial for. Siegel also testified that defendant gave him money to use to set up a drug deal. Siegel stated:

It was [defendant's] idea [to do the drug deal] to be able to get rid of the money by purchasing drugs or illegal things....

. . . .

I told [defendant] that I showed a person $20,000, and he—the guy told me that he can get me kilos of cocaine.

. . . .

I told [defendant] that I'd need more money. I said I would like to have all the money to purchase—I'm not 100 percent positive—I can't remember if it was five kilos or ten kilos—so I can go down and show this guy that I had all the money.

Siegel further testified that defendant then gave him $190,000 in counterfeit bills to go through with the deal. However, Siegel testified that the deal ended up falling through.

The Government claims that this testimony was admissible as direct evidence. We agree.

■ To convict defendant under 18 U.S.C. § 473, the Government had to prove that defendant intended the counterfeit bills to be passed as genuine. Evidence that defendant passed counterfeit notes at bars, nightclubs and restaurants and was involved in a failed "counterfeit-for-drugs" transaction was relevant to show a plan or intent under Rule 404(b) to pass as genuine the same notes which were used in the charged offense.[2]

### D. The Firearms Offense

#### 1. "During and in Relation to" a Drug Trafficking Offense

To convict defendant under § 924(c)(1), the Government had to prove that defendant carried or used a firearm *during and in relation to a crime of violence or a drug trafficking offense.*

■ In the present case, defendant's whole theory of defense is that he did not intend to engage in a drug transaction. He claims that he only intended to engage in a counterfeit-for-cash transaction. It is possible that on retrial of this case, a jury could find that defendant did not intend to engage in a drug transaction. Thus, a jury could find that defendant did not carry a firearm "during and in relation to" a drug trafficking offense. This is a decision a jury must make in light of the evidence at the new trial. We therefore reverse the § 924(c)(1) conviction (count two) and remand for a new trial.[3]

#### 2. Sufficiency of the Evidence

■ Defendant claims that there is insufficient evidence to convict him under 18 U.S.C. § 924(c)(1) for carrying or using a firearm during and in relation to a drug trafficking crime. Even though we reverse that conviction because of errors in the presentation of the proof of the specific drug charge in count one, "we must address the sufficiency of the evidence supporting it, for if the evidence were insufficient, retrial is barred by the Double Jeopardy Clause." *United States v. Lewis,* 787 F.2d 1318, 1323 (9th Cir.1986), *amended on other grounds,* 798 F.2d 1250 (9th Cir.1986).

#### (a) Standard of Review

There is sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

#### (b) "Using or Carrying" a Firearm

To convict defendant of violating § 924(c)(1), the Government must prove that defendant "used or carried" a firearm during and in relation to a drug trafficking crime. The Government concedes that defendant's conviction cannot be affirmed based upon a theory that defendant "used" the firearms.

2. On any retrial, there may be a Fed.R.Evid. 403 issue regarding this evidence. If the question is raised in the district court, we express no opinion on its merits.

3. Our holding does not mean that a defendant must be convicted of a drug trafficking offense in order to be convicted under § 924(c)(1). To the contrary, a jury could convict a defendant of violating § 924(c)(1) even where a drug trafficking offense has not been charged or where the jury acquits the defendant of the underlying drug trafficking offense, as long as it finds that the defendant did commit the underlying crime. *See United States v. Bracy,* 67 F.3d 1421, 1430 (9th Cir.1995); *United States v. Hunter,* 887 F.2d 1001, 1003 (9th Cir.1989), *cert. denied,* 493 U.S. 1090, 110 S.Ct. 1159, 107 L.Ed.2d 1062 (1990) ("a defendant charged with violating section 924(c)(1) must be proven to have committed the underlying crime, but nothing in the statute or the legislative history suggests that he must be charged with and convicted of the underlying offense").

Thus, the only issue before us is whether there is sufficient evidence to support a conviction on the theory that defendant "carried" the firearms.

 "[I]n order for a defendant to be convicted of 'carrying' a gun in violation of section 924(c)(1), the defendant must have transported the firearm on or about his or her person." *United States v. Hernandez,* 80 F.3d 1253, 1258 (9th Cir.1996). "This means the firearm must have been immediately available for use by the defendant."

 In the present case, the guns at issue in the § 924(c)(1) conviction were located on the floor of the van. One of the guns was underneath the front passenger seat of the van, and the other was underneath the driver's seat of the van. At the time of the drug transaction, and at the time of the arrest, defendant was sitting in the front passenger seat of the van. Thus, both of the guns were within his reach and were therefore immediately available for use by defendant.

Furthermore, defendant requested that Siegel bring the guns to help him to carry out the transaction. Siegel gave defendant one of the guns, and Siegel kept the other gun. Thus, it is clear that defendant intended to have the guns immediately available for his use during the drug transaction.

Finally, it is also significant that both of the guns were loaded. This is not a case where the guns were simply lying on the floor of a vehicle unavailable for immediate use.

Because defendant transported the firearms on or about his person, and because the firearms were immediately available for use by defendant, the defendant "carried" a firearm within the meaning of § 924(c)(1). *See Hernandez,* 80 F.3d at 1258. The evidence was therefore sufficient to support a conviction on the theory that defendant "carried" the firearms in violation of § 924(c)(1). *See id.; see also United States v. Riascos–Suarez,* 73 F.3d 616, 623 (6th Cir.1996) (upholding a conviction for carrying a firearm in violation of § 924(c)(1) where the gun was visibly placed in the driver's side console),

*cert. denied,* —— U.S. ——, 117 S.Ct. 136, 136 L.Ed.2d 84 (1996).

**E. Jury Instructions**

Both parties agree that the district court's jury instruction on the § 924(c)(1) charge was erroneous. Because we reverse the § 924(c)(1) conviction, we need not determine whether the district court's erroneous jury instruction prejudiced defendant.

## CONCLUSION

The district court erred in refusing to grant defendant a new trial based on the *Brady* violation. We therefore reverse defendant's conviction of conspiracy to possess more than five kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. § 846 (count one) and remand for a new trial.

There was sufficient evidence to support defendant's conviction for "carrying" a firearm. However, because we reverse the underlying drug trafficking offense, we also reverse defendant's conviction for carrying or using a firearm during and in relation to a drug trafficking offense in violation of § 924(c)(1) (count two) and remand for a new trial. Defendant does not challenge any of the counterfeiting convictions (counts three, four, and five of the indictment), and we therefore affirm the convictions on each of those counts.

Convictions AFFIRMED in part, REVERSED in part, sentences VACATED, and the case REMANDED for further proceedings.