110 F.3d 70
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
The UNITED STATES, Plaintiff-Appellee,
v.
Michael Lamont BOURGEOIS, a/k/a, Lil Mike, Defendant-Appellant.
 No. 95-50474.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 7, 1996.
Decided March 20, 1997.
As Amended on Denial of Rehearing June 6, 1997.
 
 1
 Appeal from the United States District Court for the Central District of California, No. CR 94-00374-TJH-1; Terry J. Hatter, Jr., District Judge, Presiding.
 
 
 2
 C.D.Cal.
 
 
 3
 REVERSED.
 
 
 4
 Before: FLETCHER, TASHIMA, Circuit Judges, and RESTANI,* United States Court of International Trade Judge.
 
 
 5
 MEMORANDUM**
 
 
 6
 Defendant-appellant, Michael Lamont Bourgeois, a/k/a "Lil Mike," ("Bourgeois"), appeals his conviction by jury for conspiracy and theft of firearms from a federally licensed firearms dealer. Bourgeois also appeals his conviction and sentence by the court as a felon in possession of a firearm. For the following reasons, we reverse and remand the case for a new trial.
 
 PROCEDURAL BACKGROUND
 
 7
 On July 1, 1994, Bourgeois and co-defendants La Gene Smith ("Smith"), Sammie Lee Ford, a/k/a "Baby Main" ("Ford"), Cedric Gunter, a/k/a "Little Cedric" ("Gunter"), and George Batiste Thenarse ("Thenarse"), were charged with various firearm offenses. All defendants were charged in Count One with conspiracy pursuant to 18 U.S.C. § 371, in Count Two with receipt of stolen firearms pursuant to 18 U.S.C. § 922(j), and in Count Three with theft of firearms from a federally licensed firearms dealer pursuant to 18 U.S.C. § 922(u). In addition, Bourgeois and co-defendants Smith, Ford, and Gunter were charged in Count Four with being felons in possession of a firearm pursuant to 18 U.S.C. § 922(g)(1). All of these offenses pertained to gun store burglaries which occurred in April 1994.
 
 
 8
 The district court bifurcated the trial of Counts One through Three from the trial of Count Four and conducted a jury trial on those counts. The court denied defense motions for acquittal, which were made at the end of the government's case, the defense case, and the presentation of all evidence, but granted Bourgeois's mid-trial motion to dismiss Count Two on grounds of multiplicity. The jury convicted Bourgeois of Counts One (conspiracy) and Three (theft). After the jury was excused, the court, having received waivers of jury trial as to Count Four, found Bourgeois guilty of Count Four (felon in possession). Bourgeois was sentenced to concurrent sentences of 60 months on Count One, 120 months on Count Three, and 180 months on Count Four with three years supervised release and $150 in special assessments.
 
 FACTUAL BACKGROUND
 
 9
 Bourgeois's conviction arose from an attempted burglary of Weatherby's Gun Store ("Weatherby's") in Southgate, California, on April 13, 1994 [hereinafter "the Weatherby's attempt"]; a burglary of Stockade Gun Store ("Stockade") in Westminster, California, on April 22, 1994 [hereinafter "the Stockade burglary"]; and an attempted burglary of B & B Sales in Westminster, California, on April 26, 1994 [hereinafter "the B & B Sales attempt"]. All of these offenses were alleged as overt acts in the conspiracy count. The Stockade burglary formed the basis for the theft of firearms and felon in possession counts.
 
 A. The Weatherby's Attempt
 
 10
 On April 13, 1994, at approximately 4:30 a.m., local police interrupted a burglary in progress at Weatherby's Gun Store. Calvin Caples, a/k/a "Blue Rag" ("Caples") and Reginald Bass ("Bass") were arrested nearby. Three prybars and a set of bolt cutters were found in the parking lot, and the hinges and frame of the rear door were damaged.
 
 
 11
 At trial, Dwayne Washington ("Washington") testified, pursuant to a plea agreement, that he participated in the burglary with Bourgeois, Caples, codefendants Gunter and Ford, and an individual identified as Shelton. Washington testified that the day before the burglary attempt, Bourgeois asked him and Ronnie Burnett to drive him to Weatherby's to "check it out." Washington also testified that Bourgeois returned to the car and told them that the burglary was "on" and the store "had a lot of semiautomatics." Washington identified the government's exhibits, consisting of bolt-cutters, crowbars, and a digging bar, as the tools used in the Weatherby's attempt. Washington also testified that he, Bourgeois, and others attempted to break in the back door of Weatherby's, but fled when the police came. The defense impeached Washington's testimony with prior inconsistent statements including assertions that: he did not participate in any gun store burglary in 1994; an individual identified as "Snake" was involved in the 1994 gun store burglaries; no bolt-cutters were used at Weatherby's; and no one acted as a lookout during the burglaries.
 
 
 12
 Caples also testified, pursuant to a plea agreement, that he participated in the Weatherby's attempt with Bourgeois, Washington, co-defendants Gunter and Ford, and one other person. Caples testified that Bourgeois and Ford came to his house on the night of the Weatherby's attempt and asked him to participate. Caples testified that Bourgeois concealed the tools to be used in the burglary in a sand box outside of his apartment. The defense impeached Caples's testimony with evidence of his prior convictions for sale of marijuana, false identification to a police officer, as well as his prior inconsistent statements that: he had met Bourgeois four years ago, that Ford had asked him to participate in the burglary, that Bourgeois had been wearing gloves, and that he went across the street with the other participants after arriving at Weatherby's.
 
 
 13
 Special Agent Brad Galvan ("Agent Galvan") of the Bureau of Alcohol, Tobacco and Firearms, testified that, on April 14, 1994, after Caples had agreed to cooperate, Caples "went into detail" with respect to Bourgeois's involvement in the Weatherby's attempt. Agent Galvan testified that Caples,
 
 
 14
 described that Michael Bourgeois was the ringleader of a burglary ring, and that he was present during--before the burglary. That Michael Bourgeois was one of the persons who went to his house on the night of the 12th of this year and recruited him to accompany them to do a crime.
 
 
 15
 Agent Galvan also testified that Washington told him on June 16, 1994, approximately three weeks after he agreed to cooperate, that he had participated in the Weatherby's attempt. Agent Galvan testified that, thereafter, he took Washington to Weatherby's. Agent Galvan claimed that he asked Washington to describe exactly what happened with respect to Weatherby's and that Washington "led [him] into a series of events which culminated with him and others going to the rear door of Weatherby's where they attempted to make entry."
 
 
 16
 Bourgeois presented an alibi for the morning of April 13, 1994. Bourgeois's cousin, Micarol Jones, testified that Bourgeois was living at her house at this time, and he was at home at the time of the Weatherby's attempt. Jones remembered that night because several friends stayed over at her house for a party. Bourgeois testified that he had been at home the entire night of the party. The alibi was corroborated by La Shawn Rhodes, Angelic Bingham, and T'Eonia Dunbar.
 
 B. The Stockade Burglary
 
 17
 On April 22, 1994, at approximately 4:26 a.m., local police responded to an alarm at Stockade. Several iron bars had been cut and bent to make an opening at the far southeast portion of the front window. Inside the store, glass display cases had been smashed and handguns were scattered on the ground. Ninety-three firearms had been stolen, of which, eighty-three were manufactured outside California. A Stockade employee felt "uncomfortable" and alerted store staff when Bourgeois, Gunter, and Thenarse entered the store two or three days before the burglary. The employee testified that they then asked him which .45 Colts were the most expensive or the most valuable.
 
 
 18
 At trial, Washington testified that he participated in the Stockade burglary with six other people, including Bourgeois. Washington testified that two of the co-defendants cut the bars on the window, and afterwards they crawled through the window. Washington claimed that he, Bourgeois, and the other co-defendants all went inside the store and put guns in their pillowcases. Washington testified that he saw Bourgeois with a pillowcase that appeared to be full and that he later saw Bourgeois take a pillowcase out of the trunk, pull out a "Desert Eagle," and cock it. Washington also claimed that he saw Bourgeois sell a few guns later that day.
 
 
 19
 The defense again impeached Washington's testimony with his prior inconsistent statement denying that he participated in any gun store burglary in 1994. Washington's testimony was further impeached with his denials of several prior inconsistent statements. Specifically, Washington denied telling Agent Galvan that the burglars used a crow bar to open the door to Stockade and used bolt-cutters to cut an inside lock. Agent Galvan subsequently testified that Washington did make these prior inconsistent statements.
 
 
 20
 Agent Galvan also testified that Washington told him on June 16, 1994 that he participated in the Stockade burglary. Agent Galvan testified that he later took Washington to Stockade and asked him to describe what happened. According to Agent Galvan, Washington,
 
 
 21
 began to go into a series of events. And he told me where they pulled up, where some cars had parked, where he had parked. And then how they made entry into the store and the location of that entry. What side of the store they made entry to, which was the right side, and what window.
 
 
 22
 Finally, the government called a criminalist who testified that by comparing the bolt-cutters seized from the trunk of the car used in the burglary with the iron bars cut during the burglary that the bolt-cutters appear to have been the bolt-cutters used during the burglary.
 
 
 23
 Bourgeois denied participating in the Stockade burglary. He indicated that he had been arrested on April 26, 1994, and that, for four to five days before that, he had stayed home with the flu. During this time, he claims he left the house only once to give his daughter's mother some money. This testimony was corroborated by his cousin, Micarol Jones.
 
 C. The B & B Sales Attempt
 
 24
 On April 26, 1994, Bourgeois was arrested shortly after 4:00 a.m., in Huntington Beach, California. Bourgeois had been a passenger in a car with three others. Police found bolt-cutters in the car's trunk, and three pairs of gloves, two flashlights and three pillowcases hidden in the car's passenger compartment.
 
 
 25
 Washington testified that on that night, he and several other people, including Bourgeois and Shawn Spencer ("Spencer"), got into two cars to drive to a planned burglary. Washington testified that, while driving to the gun store, a police car began following the other car. In response, the car he was in returned to the freeway. Other testimony showed that the police stopped the car containing Thenarse, Burnett, Gunter and Bourgeois and arrested the occupants. Washington testified that, the following day, Bourgeois told him that he hoped Thenarse "don't tell."[1] Again, the defense impeached Washington's testimony by his prior inconsistent statement denying participation in any 1994 gun store burglary.
 
 
 26
 Bourgeois denied that he was ever part of any plan to burglarize the gun store. Bourgeois testified that he had been with several other people, including Gunter, Thenarse, Burnett, and Spencer, since approximately 5:00 p.m. the night of the burglary. Bourgeois claimed that they had been drinking liquor on the beach and were on their way home when they were stopped by the police. Bourgeois testified that Washington had not been with them and denied any knowledge of the bolt-cutters in the trunk, or the gloves and pillowcases in the car. Spencer substantially corroborated Bourgeois's testimony.
 
 JURISDICTION
 
 27
 The district court had jurisdiction over this matter pursuant to 18 U.S.C. § 3231. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.
 
 DISCUSSION
 I.
 
 28
 Bourgeois argued at trial and on appeal that the district court erred in admitting Agent Galvan's testimony recounting prior consistent statements made by Caples and Washington in violation of the rules of evidence and his constitutional confrontation rights. At trial, the government contended that the district court properly admitted the statements as admissions against penal interest, as rehabilitation, and/or under the rule of completeness. On appeal, the government relies on rehabilitation and the rule of completeness[2] to support the admission of Agent Galvan's testimony as such statements were the subject of extensive defense examination of the declarants.
 
 
 29
 We review whether the district court correctly construed the hearsay rule de novo. United States v. Collicott, 92 F.3d 973, 978 (9th Cir.1996). District courts, however, are granted broad discretion in admitting evidence, and their rulings are reviewed only for an abuse of discretion. Id. Moreover, admission of evidence may be upheld on appeal if the evidence was admissible on an alternative ground. United States v. Nazemian, 948 F.2d 522, 530 (9th Cir.1991), cert. denied, 506 U.S. 835 (1992).
 
 A. Rule 801(d)(1)
 
 30
 Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial ... offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Such testimony is generally not admissible except as otherwise provided. Id. 802. A statement is not hearsay, however, if:
 
 
 31
 [t]he declarant testifies at the trial ... and is subject to cross-examination concerning the statement, and the statement is ... consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive....
 
 
 32
 Id. 801(d)(1)(B).
 
 
 33
 With regard Rule 801(d)(1)(B), the Supreme Court made clear in Tome v. United States, 115 S.Ct. 696, 705 (1995), that the rule "permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent fabrication or improper influence or motive." The Court further stated that prior consistent statements by a witness "may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited." Id. at 701. In Tome, the defendant claimed that his daughter's allegations of molestation were fabricated so that she could remain in her mother's custody. Id. at 699. To rebut this claim, the government introduced testimony of six witnesses about seven prior statements by the daughter pertaining to the molestation charges. Id. The Court reversed the conviction, noting that "[a]lthough those statements might have been probative on the question whether the alleged conduct had occurred, they shed but minimal light on whether [the daughter] had the charged motive to fabricate." Id. at 705.
 
 
 34
 Under Rule 801(d)(1)(B), a proponent must establish four elements:
 
 
 35
 (1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony; (3) the proponent must offer a prior consistent statement that is consistent with the declarant's challenged in-court testimony; and, (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose.
 
 
 36
 United States v. Collicott, 92 F.3d at 979. In Collicott, on direct examination, the government called a witness, Zaidi, who testified to a drug transaction between the defendant and an individual named Luis that occurred in the motel room she shared with the defendant. See id. at 976. On cross-examination, defense counsel asked Zaidi whether she recalled telling arresting officer Kehl that Luis came to the motel room between midnight and 1:00 a.m. that morning. Id. Zaidi did not remember making such a statement. Id. Collicott then called Officer Kehl to the stand and asked on direct examination if Zaidi made such a statement to him, to which he answered, "Yes." Id. at 976-77. The government then attempted to examine Officer Kehl about the remainder of the statements made by Zaidi to Kehl at the time of Collicott's arrest. Id. at 977. The district court overruled the defense's objection and allowed Kehl to testify in detail as to what Zaidi told him. Id. at 977-78. On appeal, the court found the statements inadmissible under Rule 801(d)(1)(B), the "opened door" rationale, Rule 106, and Rule 803(5). See id. at 978-84. Finding such error to be harmful, the court reversed the conviction. Id. at 984.
 
 
 37
 In the present case, Agent Galvan testified to statements Caples and Washington made to Agent Galvan after either being arrested or agreeing to cooperate with the government. Caples and Washington, thus, made the prior consistent statements only after they had a motive to fabricate. Statements made after the declarant had a motive to falsify cannot rebut a charge of recent fabrication or improper motive. See id. at 979 (stating, "the plain language of Rule 801(d)(1)(B) does not suggest that where a party inquires into part of a conversation, the opposing party may introduce the whole conversation as substantive evidence under the Rule even though the statements do not rebut a charge of recent fabrication or improper motive"). As the government has failed to satisfy this requirement of the Rule and Tome, it may not rely on Rule 801(d)(1)(B) for admission of Caples and Washington's prior consistent statements as substantive evidence.
 
 B. "Opened Door" Rationale
 
 38
 The government contends that Rule 801(d)(1)(B) did not provide the only basis for admissibility of Agent Galvan's statements. The government claims that the Court in Tome expressly left open whether the statements at issue were admissible "under any other evidentiary principle" and stressed that its holding "is confined to the requirements for admission under Rule 801(d)(1)(B)." 115 S.Ct. at 705. The government argues that the statements were properly admitted either for rehabilitation under an "opened door" rationale or under the rule of completeness, given that the interviews were the subject of the defense's extensive examination of the declarants. In Collicott, we recognized that under the "opened door" rationale, "this Circuit has historically allowed a party to introduce prior statements because they were part of the same conversation or document from which impeaching inconsistent statements were drawn." 92 F.3d at 979-80 & n. 3 (noting however, that cited cases "confuse the relationship between the 'opened door' rationale and Rule 801(d)(1)(B)").
 
 
 39
 The government claims that the cases cited in Collicott make explicit that, once an inconsistent statement has been admitted, other portions of the interviews are admissible to allow the jury to gauge whether it is in fact an inconsistency and, if so, the extent to which the inconsistency is material. The government argues that it was entitled to present the balance of the statements made during the interviews in which Caples and Washington are alleged to have made inconsistent statements so that the jury can determine, in the full context of those recorded interviews, whether the statements offered by the defense were, in fact, impeaching. We stated in Collicott, however, that,
 
 
 40
 After a witness has been impeached with prior inconsistent statements, we have admitted the entire conversation or document from which the impeachment statements were drawn if it has significant probative force bearing on credibility apart from mere repetition ... by plac[ing] the inconsistencies ... in a broader context, demonstrating that the inconsistencies were a minor part of an otherwise consistent account.
 
 
 41
 92 F.3d at 980 (footnote and quotations omitted).
 
 
 42
 Washington's prior consistent statements recounted by Agent Galvan, however, were not made during the same interview as the prior inconsistent statements with which the defense attempted to impeach Washington. Washington testified that he participated in the Stockade burglary with Bourgeois and that the mode of entry was through a window. On cross-examination, the defense attempted to impeach Washington with his prior statement to Agent Galvan on June 16, 1994, that the burglars had entered through the door of the Stockade; Washington, however, denied that he ever told Agent Galvan that the burglars had entered the Stockade through the door. Before defense counsel had the opportunity to impeach Washington by bringing in his prior inconsistent statement through Agent Galvan, the government elicited testimony from Agent Galvan that he took Washington to the Gun Store Stockade in August 1994, at which time Washington told him that the burglars had entered through the window. This prior consistent statement, thus, was made approximately two months after the prior inconsistent statement. Accordingly, the rationale that Bourgeois "opened the door" for this statement does not apply. Washington's August 1994 statement cannot be used to bear upon the credibility of his apparent inconsistent statement that was made two months earlier.
 
 
 43
 The record does not establish whether Caples's prior consistent statement was made during the same interview as his prior inconsistent statements. The government, as proponent, has the burden of establishing the grounds for admission, which it failed to do. Accordingly, the government may not rely on a rehabilitative purpose to admit Agent Galvan's testimony of prior consistent statements by Caples and Washington as it has not satisfied the requirements of Rule 801(d)(1)(B), or established that the statements offered were made in the same context as the inconsistent statements.
 
 C. The Rule of Completeness
 
 44
 The rule of completeness is set forth in Fed.R.Evid. 106 as follows:
 
 
 45
 When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.
 
 
 46
 The Advisory Committee Notes state, in relevant part:
 
 
 47
 The rule is based on two considerations. The first is the misleading impression created by taking matters out of context. The second is the inadequacy of repair work when delayed to a point later in the trial.... For practical reasons, the rule is limited to writings and recorded statements and does not apply to conversations.
 
 
 48
 Fed.R.Evid. 106 advisory committee's note. We stated in Collicott that, "[t]he rule of completeness requires that a full document or set of documents be introduced: '[W]hen one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is ipso facto relevant and therefore admissible....' " 92 F.3d at 983 (quoting Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 172 (1988)).
 
 
 49
 We find that the prior consistent statements by Caples and Washington made to Agent Galvan were not admissible under Rule 106. At the outset, we note that Rule 106 is inapplicable because no writing or recorded statement was introduced by a party. Moreover, "Rule 106 does not compel admission of otherwise inadmissible hearsay evidence." Id. (quotations omitted). Thus, Rule 106 would not protect internal hearsay within a document or recorded statement. As the statements by Caples and Washington to Agent Galvan are objectionable hearsay, they are inadmissible. In addition, as in Collicott, the statements here do not serve to correct a misleading impression by a prior statement created by taking Caples' and Washington's statements out of context. As a result, the rule of completeness does not provide an adequate basis for admission of the prior consistent statements.
 
 II.
 
 50
 The government argues that any improperly admitted statements were harmless. "Nonconstitutional errors are harmless unless the reviewing court has grave doubt whether the erroneously admitted evidence substantially affected the verdict." Collicott, 92 F.3d at 984. This standard is the same as the "fair assurance" standard. See United States v. Crosby, 75 F.3d 1343, 1349 (9th Cir.1996).
 
 
 51
 The government argues that proof of defendant's participation did not depend on Caples' and Washington's testimony alone. Bourgeois was traveling towards B & B Sales in a car containing the same bolt-cutters that were used to break into Stockade, as proven by laboratory analysis. A Stockade employee identified Bourgeois "casing" the store. Various witnesses testified to details that corroborated Caples' and Washington's description of the burglaries. Finally, the government claims that the fact that Caples' and Washington's testimony was not the crux of the government's case is also shown by the jury's acquittal of co-defendant Smith, against whom the only direct evidence was Washington's testimony.
 
 
 52
 We find, however, that admission of Agent Galvan's testimony regarding Caples' and Washington's prior consistent statements was reversible error as Caples' and Washington's testimony was the only direct evidence that Bourgeois participated in the Weatherby's attempted burglary. Furthermore, Washington's testimony was the only direct evidence that Bourgeois participated in the Stockade burglary, although a Stockade employee testified that he felt uncomfortable when he saw Bourgeois, Gunter, and Thenarse enter the store and ask which guns were the most valuable two or three days before the burglary. Accordingly, Caples' and Washington's credibility was essential to the government's case. Furthermore, although Bourgeois was found at the time of the alleged B & B Sales attempt, four days after the Stockade burglary, as a passenger in co-defendant Thenarse's car wherein police discovered a pair of bolt-cutters in the trunk, Washington's testimony was the only evidence that Bourgeois knew of the presence of the bolt-cutters. Washington's testimony, thus, was critical to any evidentiary value that the bolt-cutters may have had with respect to Bourgeois.[3] Consequently, we cannot find that the admission of these statements was more likely than not harmless.
 
 
 53
 Accordingly, we must reverse and remand this case for new trial.
 
 III.
 
 54
 Bourgeois also contends that there was insufficient evidence to sustain his conviction as a felon in possession of a firearm in or affecting interstate commerce under 18 U.S.C. 922(g). Although we reverse that conviction due to errors at trial, we must now address Bourgeois's claim, " 'for if the evidence were insufficient, retrial is barred by the Double Jeopardy Clause.' " United States v. Steinberg, 99 F.3d 1486, 1493 (9th Cir.1996) (quoting United States v. Lewis, 787 F.2d 1318, 1323, amended on other grounds, 798 F.2d 1250 (9th Cir.1986)).
 
 
 55
 Bourgeois contends that he could not have been convicted of possessing a firearm in or affecting interstate commerce as not all of the firearms stolen from the Stockade traveled in interstate commerce. A conviction under 18 U.S.C. 922(g) requires proof beyond a reasonable doubt that the firearm in question was possessed in or affecting interstate commerce. United States v. Alvarez, 972 F.2d 1000, 1003 (9th Cir.1992). Absent such proof, 922(g) would violate the Commerce Clause. See United States v. Hanna, 55 F.3d 1456, 1462 n. 2 (9th Cir.1995) (upholding 922(g) against Commerce Clause challenge because 922(g) requires proof that firearm had been in interstate commerce). After viewing the evidence in the light most favorable to the prosecution, we decide whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Alvarez, 972 F.2d at 1002 n. 1.
 
 
 56
 Bourgeois claims that the only evidence presented to show that he possessed any firearm was Washington's testimony concerning the Stockade burglary. This testimony establishes that six people, including Bourgeois, were in possession of 93 stolen firearms. Relying on Government Exhibits 15 and 42, the government argues that only three of the 93 firearms stolen from the Stockade had not traveled in interstate commerce. Government Exhibit 15 is a Westminster police report dated April 25, 1994, wherein the Stockade owner listed the 101 guns she believed stolen (she later found eight guns she originally believed stolen). The report, however, does not specify the origin of any of the stolen guns or whether they had traveled in interstate commerce. Government Exhibit 42 consisted of the Stockade business records which recorded the receipt and distribution of 159 guns by the Stockade. Of these 159 guns referenced in Exhibit 42, ten of them are listed as stolen on April 22, 1994. The parties stipulated that all but three specific guns of the 159 guns referenced were obtained from out of state distributors. These three guns were among the 93 stolen.[4] The parties also stipulated that of the 93 firearms stolen from the Stockade, 83 of those guns were manufactured outside of California. Accordingly, Bourgeois claims that as many as ten of the 93 stolen firearms were not shown to have traveled in interstate commerce. The government counters that although only 83 of the 93 firearms stolen from the Stockade were manufactured outside of California, the evidence as to the 159 guns supports the inference that only three of the ten firearms made in California did not travel in interstate commerce before the burglary. We conclude that the evidence does not support this inference.
 
 
 57
 The government further argues that Bourgeois was in constructive or joint possession of all 93 firearms. To prove possession under 922(g), the government need not prove that a defendant had "exclusive actual possession" of the firearm, it instead may prove constructive or joint possession. United States v. Bernard, 48 F.3d 427, 430 (9th Cir.1995) (quoting United States v. Soto, 779 F.2d 558, 560, amended, 793 F.2d 217 (9th Cir.1986)). To establish constructive possession, "the government must produce evidence showing ownership, dominion or control over the contraband itself or the premises or vehicle in which the contraband is concealed." Soto, 779 F.2d at 560 (quotations omitted).
 
 
 58
 Washington's testimony establishes that Bourgeois had control over the guns in his pillowcase. According to Washington, six people entered the Stockade during the burglary and each of them had a pillowcase. Washington also testified that he saw Bourgeois return in Thenarse's car, take his pillowcase out of the trunk of the car, and then take a "Desert Eagle" firearm out of his pillowcase. Washington testified that he personally had approximately 15 guns in his pillowcase.[5] Although Washington could not say how many guns Bourgeois had stolen, he testified that the pillowcase Bourgeois was holding appeared to be full. As there were six burglars and 93 stolen guns, if the burglars had grabbed an even share of the guns from the Stockade, each would have had 15 or 16 guns. Moreover, Washington testified that defendant Gunter's pillowcase appeared to be only "halfway full." Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Bourgeois possessed in his full pillowcase either more than ten firearms or one of the 83 firearms that had traveled in interstate commerce.
 
 
 59
 Accordingly, we hold that the evidence was sufficient to support Bourgeois's conviction under 18 U.S.C. 922(g).
 
 
 
 *
 Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Bourgeois asserts that the only evidence that B & B Sales was the target of the burglary was the testimony of Roger Thomas, a B & B Sales employee, who claimed that he noticed a person enter the store, sometime in April 1994, who didn't fit the normal customer profile. Thomas had previously identified Thenarse in a photo-array, but was unable to identify any of the defendants at trial
 
 
 [2]
 The government does not rely upon the statement against penal interest exception, under Fed.R.Evid. 804(b)(3), as that exception is premised on the unavailability of the declarant
 
 
 [3]
 Bourgeois also seeks to discredit the government's expert in tool mark identification based on the expert's inexperience, the lack of treatises and scientific publications in tool mark identification, and impeachment of the expert at trial. As the bolt-cutters were linked to Bourgeois only by Washington's testimony, we need not consider this
 
 
 [4]
 The parties stipulated that these three guns had the serial numbers: C01839, C01843, and M03354
 
 
 [5]
 The government claims that as the "Desert Eagle" was not one of the three firearms stipulated to have traveled only within California, Bourgeois was in actual possession of a firearm that had traveled in interstate commerce. We cannot accept this conclusion, however, as the government failed to present any specific evidence to show that the "Desert Eagle" firearm had traveled in interstate commerce