Benjamin Wai SILVA, Petitioner– Appellant,

v.

Jeanne S. WOODFORD, Warden, San Quentin State Prison, Respondent–Appellee.

No. 99–99009.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 13, 2000.

Filed Feb. 1, 2002.

Amended Feb. 22, 2002.

Phillip A. Trevino, Michael J. Brennan, Beverly Hills, CA, for the petitioner–appellant.

Robert M. Foster, Deputy Attorney General, San Diego, CA, for the respondent–appellee.

Before B. FLETCHER, THOMAS, and WARDLAW, Circuit Judges.

## OPINION

BETTY B. FLETCHER, Circuit Judge.

Benjamin Wai Silva, who is on death row in California for the murder of Kevin Thorpe in 1981, appeals from the denial of his petition for a writ of habeas corpus. Because we find that Silva's counsel was constitutionally ineffective in failing to investigate and present potentially compelling mitigating evidence to the jury, we grant the writ as to the penalty phase, vacate his death sentence, and remand for a new sentencing hearing. In addition, we remand for an evidentiary hearing into Silva's *Brady* claim that the prosecution failed to disclose an agreement that the state's key witness not be psychiatrically examined until after the trial. We deny all of his other claims.

### I.

*Factual Background*

Silva stands convicted of the gruesome abduction, robbery and murder of Thorpe in Madeline, California. Thorpe and his girlfriend, Laura Craig, were college students returning from winter break when they passed through Madeline on their way to Oregon. On January 11, 1981, Silva and two accomplices, Joe Shelton and Norman Thomas, kidnaped Thorpe and Craig after spotting the couple at a filling station in town. The three men forced the couple to drive to Shelton's property and proceeded to take their cash and belongings. Thorpe was then chained to a tree while Craig was taken inside a cabin and repeatedly sexually assaulted.

The next day, Silva and Shelton killed Thorpe by inflicting multiple gunshot wounds from an automatic weapon. Thomas then dismembered Thorpe's body with an axe (purportedly on Silva's orders) and stuffed the remains into several trash bags, which were each buried in shallow graves. Several days later, Craig was shot twice and killed by the side of a road.

Thomas informed police of the murders later that month after being found in possession of a firearm in violation of his probation. In exchange for turning state's evidence, murder charges against Thomas were dropped. He was eventually sentenced to eleven years and four months imprisonment for participating in the kidnaping, being an accessory after the fact to murder, burglary, and use of a firearm.

Shelton's trial took place before Silva's. He was convicted of murdering both Thorpe and Craig and sentenced to life without parole. On direct appeal, he was resentenced to life imprisonment.

Because of publicity, Silva's trial was held in San Bernardino County in January 1982. When called to testify at Silva's trial, Shelton invoked his Fifth Amendment privilege against self-incrimination. The primary evidence regarding Silva's role in Thorpe's death came from Thomas. Thomas testified that both Silva and Shelton left the cabin in the morning after the kidnapings, and that Thorpe was murdered while Thomas was having consensual sex with Craig. According to Thomas, Silva then returned to the cabin and forced Thomas to dismember and dispose of Thorpe's body. Subsequently, the three men were standing over a barrel in which some of Thorpe's belongings were being burned, when Shelton allegedly proceeded to describe to Thomas how Thorpe had died. Shelton related how he and Silva had unlocked the chain linking Thorpe to the tree and led him terrified and crying up the side of a hill. After leaving briefly to obtain a weapon, Silva then walked up behind Thorpe and shot him up and down his body at close range, using an Ingram M-11 .38 caliber fully automatic pistol equipped with a silencer. Silva then gave the weapon to Shelton, who emptied the

rest of the magazine clip into Thorpe's body. According to Thomas, Silva simply looked on and smiled as Shelton described the slaying to Thomas.

Thomas also testified that several days after Craig's disappearance, a similar conversation took place while the three were gathered on the porch of the cabin, in which Shelton described how Craig had been shot and killed. Once again, Silva allegedly looked on and smiled while Shelton spoke to Thomas.

At the conclusion of the guilt phase, the jury deliberated for two days before finding Silva guilty of first-degree murder in the shooting death of Thorpe. However, the jury found Silva not guilty of Craig's murder. The jury also found Silva guilty of kidnaping and robbing both victims, as well as illegally possessing a machine gun and a silencer.

In the ensuing penalty phase, the jury found the existence of four special circumstances—felony murder (kidnaping for robbery), heinous murder, witness murder, and financial gain murder—ultimately leading to a sentence of death.[1] Silva was also sentenced to two consecutive life terms as well as a three-year consecutive term on the lesser charges.

A key issue raised by Silva in this appeal concerns his court-appointed trial counsel's failure to impeach or to otherwise challenge Thomas's reliability as a witness. Thomas had been involved in a motorcycle accident several years earlier and suffered severe brain damage. In addition, Silva contends that prosecutors improperly struck a deal with Thomas's at-torney, whereby he would refrain from conducting a psychiatric evaluation of his client until after Thomas testified at Silva's trial. Silva claims that information about this alleged arrangement was withheld from the defense, which could have used it to undermine Thomas's credibility before the jury.

Another prominent issue raised by Silva concerns his trial counsel's failure to investigate and put on evidence regarding his background and mental state during both the guilt and penalty phases of the trial. Silva's court-appointed trial counsel, Thomas Buckwalter,[2] never hired an investigator despite the availability of funds to do so. In response, Buckwalter claims that he wanted to contact Silva's family members and friends, but that Silva adamantly opposed such investigation and threatened to disrupt the trial if Buckwalter attempted to look into his background—a charge that Silva denies. In addition to not calling Silva's family and friends as witnesses, Buckwalter apparently took Silva's alleged directive as grounds to forego all inquiry into his past. Buckwalter also never obtained or examined available records that might have alerted him to Silva's mental health history, incarceration record, history of drug usage, and family background. Although Buckwalter hired a psychiatrist to evaluate Silva, he provided no information or direction on the type of evaluation to be performed. The resulting evaluation was, in the words of the psychiatrist, Dr. Albert French, "suboptimal"; he interviewed Silva for 45 minutes, during which time Silva was un-

---

1. Under California Penal Code § 190.3, a finding of just one special circumstance renders a defendant who has been convicted of first-degree murder eligible for the death penalty. California is also a "weighing" state; during the sentencing phase, the jury is instructed to balance the weight of all aggrava-ting and mitigating factors in deciding whether or not to impose the death penalty.

2. Buckwalter had over twelve years experience as a criminal defense attorney lawyer at the time of Silva's trial, including one prior death penalty case.

willing to speak candidly because he believed the phone used for the interview was being monitored by prison authorities.

As a result, Silva contends in this appeal that Buckwalter was unable to gather evidence about potential mental defenses to a charge of first-degree murder[3] during the guilt phase. In addition, during the penalty phase, Buckwalter failed to present a raft of available evidence in mitigation. All told, Buckwalter called a total of four witnesses in the penalty phase, comprised of three friends who essentially testified that Silva was not a violent man, and one police officer who testified that Silva had complained to him about mistreatment by other officers. As the California Supreme Court noted in denying Silva's direct appeal, the prosecutor's main argument to the jury during sentencing was the dearth of evidence in mitigation of the crimes. *People v. Silva*, 45 Cal.3d 604, 634, 247 Cal.Rptr. 573, 754 P.2d 1070 (Cal.1988) ("The prosecutor emphasized this central point: That nothing mitigated the circumstances of this crime.")

Finally, during their deliberations in the penalty phase, the jurors sought an explanation from the judge as to the true meaning of "life without parole." They sent two questions to the judge: (1) Does anyone have the authority to override the penalty decided by this jury?; and (2) Does life in prison without possibility of parole mean just that, or is parole possible at some future date? The judge responded that he was unable under the law to answer either question, and referred them back to the jury instructions. Silva now contends that one juror used extrinsic evidence to aver to the other jurors that absent a death sentence, parole for Silva was still possible at some point, resulting in a substantial and injurious impact on the jury's penalty phase deliberations.

*Subsequent Procedural Background*

On direct appeal, the California Supreme Court vacated the heinous-murder, witness-murder, and financial-gain-murder special circumstance findings. In all other respects, the verdict was affirmed, including the death sentence. *Silva*, 45 Cal.3d at 604, 247 Cal.Rptr. 573, 754 P.2d 1070. The court held that evidence that Silva smiled while listening to the description of his participation in Thorpe's murder was sufficiently relevant to be submitted to the jury under the adoptive admissions hearsay exception. It also held that there was sufficient evidence to sustain the felony-murder special circumstance finding, and that the jury's consideration of the three invalid special circumstance findings was harmless error which did not affect the jury's sentencing decision.

Two subsequent state habeas petitions were summarily denied without a hearing. Following denial of certiorari review of the second petition by the U.S. Supreme Court, Silva filed a federal habeas corpus action in the Central District of California in June 1990. In April 1991, the district court issued a tentative opinion denying the writ. In February 1993, Silva (through new counsel) filed a second amended habeas petition that incorporated by reference the claims raised in the first petition and also raised two new issues—the constitutional vagueness of the California death penalty statute, which has since

---

**3.** Cal.Penal Code § 189 (West 1980) reads, in pertinent part, as follows:

All murder which is perpetrated by means of a bomb, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree.

been resolved by the U.S. Supreme Court,[4] and a host of new allegations concerning ineffective assistance of trial counsel.

After initially denying Silva's request for an evidentiary hearing on the new claims, the district court changed course in May 1994 and granted a limited request for discovery and an evidentiary hearing on the ineffectiveness claims. Following the passage of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), the state Attorney General moved to vacate the evidentiary hearing on the grounds that AEDPA prohibited such a hearing. On June 24, 1996, the district court denied the motion but allowed an immediate appeal of that ruling. On July 24, 1996, Silva filed a petition for permission to appeal to our court. After initially granting such permission, the petition was dismissed as moot by a motions panel on January 16, 1997, on the grounds that AEDPA did not apply to Silva's petition, pursuant to *Jeffries v. Wood*, 103 F.3d 827 (9th Cir.1996). *See Silva v. Calderon*, 106 F.3d 409 (9th Cir.1997).

On January 27, 1999, the district court issued its ruling denying all claims raised at the evidentiary hearing. Following summation briefing, a final order from the district court was entered on February 23, 1999, which denied Silva's petition in its entirety. The district court also declined to issue a certificate of appealability ("COA"). Silva filed a timely notice of appeal on March 23, 1999, pursuant to Fed. R.App. P. 4(a).

## II.

Before addressing the merits of this case, we must perform some procedural housekeeping. In *Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), the Supreme Court recently held that 28 U.S.C. § 2253(c), as amended by AEDPA, applies to all federal habeas appeals filed after AEDPA's effective date. *Slack* establishes that regardless of the date of original filing in the district court, "when a habeas corpus petitioner seeks to initiate an appeal of the dismissal of a habeas corpus petition after April 24, 1996 (the effective date of AEDPA), the right to appeal is governed by the COA requirements now found at 28 U.S.C. § 2253(c)." *Id.* at 478, 120 S.Ct. 1595. As discussed above, although Silva's current habeas petition was filed in the district court prior to AEDPA, his notice of appeal from the district court's ruling was not filed until March 23, 1999. Thus, his right to appeal is governed by the COA requirements of post-AEDPA § 2253(c).[5]

Following *Slack*, and pursuant to 28 U.S.C. § 2253(c), we therefore must decide whether to issue a COA for each claim raised by the petitioner before we may exercise jurisdiction over this appeal.

Prior to *Slack*, we held in *Jeffries v. Wood*, 103 F.3d 827 (9th Cir.1996), that AEDPA did not apply to habeas petitions filed in the federal courts prior to the Act's effective date of April 24, 1996. As noted above, in light of this holding, a motions panel dismissed as moot Silva's petition for permission to appeal in January 1997. Furthermore, in May 1999, another motions panel issued an order granting a certificate of probable cause ("CPC") in-

---

4. In *Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), the U.S. Supreme Court held that the California death penalty statute was not unconstitutionally vague as to its definitions of special circumstances, thereby mooting Silva's claim.

5. It is important to note that in all other respects, pre-AEDPA law applies to Silva's case because his petition was filed before AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

stead of a COA, as now required under *Slack*.

However, as an appellate court panel, we are empowered to issue a COA pursuant to Fed. R.App. P. 22(b)(1)[6] and § 2253(c)(1).[7] Under similar circumstances, in *Lambright v. Stewart*, 220 F.3d 1022, 1024 (9th Cir.2000), we examined a habeas petitioner's merits briefs in deciding whether to issue a COA two weeks prior to hearing oral arguments on the merits. Similarly, in *Solis v. Garcia*, 219 F.3d 922, 926 (9th Cir.2000), we evaluated the merits briefs and decided to grant a COA, thereby gaining jurisdiction over a number of previously uncertified issues. *See also Schell v. Witek*, 218 F.3d 1017, 1021 n. 4 (9th Cir.2000); *Franklin v. Hightower*, 215 F.3d 1196, 1198–1200 (11th Cir. 2000); *Jefferson v. Welborn*, 222 F.3d 286, 288–89 (7th Cir.2000).

■ It is essential to distinguish the standard of review for purposes of granting a COA from that for granting the writ. In deciding whether to grant a COA for a particular issue, *Slack* established the following test:

[A] habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot* [*v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)], includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were " 'adequate to deserve encouragement to proceed further.' " *Barefoot*, 463 U.S. at 893, and n. 4, 103 S.Ct. 3383, 77 L.Ed.2d 1090 ("sum[ming] up" the " 'substantial showing' " standard).

*Slack*, 529 U.S. at 483–84, 120 S.Ct. 1595. In sum, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 484, 120 S.Ct. 1595.

As we stated in *Lambright*, this amounts to a "modest standard." 220 F.3d at 1024. Indeed, "we must be careful to avoid conflating the standard for gaining permission to appeal with the standard for obtaining a writ of habeas corpus." *Id.* at 1025. Notably, the *Slack* Court quoted favorably from *Barefoot*, remarking that AEDPA

---

6. Fed. R.App. P. 22(b) (West 2001) reads, in pertinent part, as follows:

 (1) In a habeas corpus proceeding in which the detention complained of arises from process issued by a state court ... the applicant cannot take an appeal unless a circuit justice or circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c).... If the district judge has denied the certificate, the applicant may request a circuit judge to issue the certificate.

 (2) A request addressed to the court of appeals may be considered by a circuit judge or judges, as the court prescribes. If no express request for a certificate is filed, the notice of appeal constitutes a request addressed to the judges of the court of appeals.

7. As amended by AEDPA, § 2253(c) (West Supp.2000) reads, in pertinent part, as follows:

 (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
 (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
 (B) the final order in a proceeding under section 2255.

 (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

 (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

§ 2253(c) was modeled after the language in *Barefoot* and simply substituted the word "constitutional" for "federal" with respect to the kind of rights violation that must be demonstrated. *Slack,* 529 U.S. at 480–84, 120 S.Ct. 1595. As a result, the Supreme Court's admonition in *Barefoot*—that in examining an application to appeal from the denial of a habeas corpus petition, "obviously the petitioner need not show that he should prevail on the merits [since h]e has already failed in that endeavor"—likewise applies to habeas petitioners attempting to meet the *Slack* standard for a COA. *Barefoot,* 463 U.S. at 893 n. 4, 103 S.Ct. 3383 (internal quotation marks and citations omitted). Furthermore, any doubts about whether the petitioner has met the *Barefoot* standard must be resolved in his favor. *See Slack,* 529 U.S. at 483–84, 120 S.Ct. 1595; *Barefoot,* 463 U.S. at 893 n. 4, 103 S.Ct. 3383; *see also Jefferson,* 222 F.3d at 289 (holding that a COA should issue unless the claims are "utterly without merit").

Consistent with *Slack, Lambright, Solis,* and *Schell,* and pursuant to Federal Rule of Appellate Procedure 22(b)(2), we therefore treat Silva's notice of appeal from the district court's ruling as an application for a COA from this court. Furthermore, since § 2253(c)(3) mandates that a court granting a COA "indicate which specific issue or issues satisfy the [COA standard]," we evaluate each of the claims raised by Silva in his petition on an issue-by-issue basis.

In this light, Silva raises the following claims: First, Silva contends that a COA should be granted on the question of whether Silva's trial counsel was ineffective in failing to investigate Silva's background and thereby secure evidence for use at both phases of the trial. Most recently in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court held that an attorney's failure to investigate may be so egregious as to violate both prongs of the ineffectiveness test established by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under the standard for obtaining a COA articulated in *Slack,* we find that the petitioner has alleged a sufficient showing of a denial of a constitutional right—i.e., such that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack,* 529 U.S. at 484, 120 S.Ct. 1595—as to justify the granting of a COA on this issue.

█ We similarly grant a COA on the issue of whether Silva's trial counsel was ineffective in failing adequately to cross-examine and challenge critical hearsay testimony offered by the state's key witness, Norman Thomas. An attorney's failure to prepare for and challenge the testimony of a critical witness may be so unreasonable as to violate both prongs of the *Strickland* test. Under the *Slack* standard, we find that the petitioner has again alleged a sufficient denial of a constitutional right as to merit a COA.

In addition, Silva claims that the district court erred in denying him discovery and relief because jurors may have used extrinsic evidence in ascertaining the meaning of the phrase "life without parole." As we stated in *Campbell v. Wood,* 18 F.3d 662, 679 (9th Cir.1994),[8] "an evidentiary hearing is required [in habeas proceedings] where the petitioner's allegations, if proved, would establish the right to relief." Given that the use of extrinsic evidence by

---

**8.** As discussed earlier, AEDPA's strictures regarding evidentiary hearings do not apply to Silva's petition. *See Lindh,* 521 U.S. at 336, 117 S.Ct. 2059; *Jeffries v. Wood,* 103 F.3d 827, 827 (9th Cir.1996).

the jury, if true, may have rendered the sentencing phase of Silva's trial constitutionally defective, we believe that the issue presented is "adequate to deserve encouragement to proceed further," since "reasonable jurists could debate" whether the district court erred in denying an evidentiary hearing on this matter. Especially in light of the fact that, as noted earlier, the jurors expressed a particular interest in the meaning of "life without parole" by querying the trial court during their deliberations, we again find that the petitioner has alleged sufficient facts to meet the *Slack* standard for issuing a COA on this issue.

Silva also seeks an evidentiary hearing on his claim that the prosecutor failed to disclose that he made Thomas agree not to be psychiatrically evaluated until after Silva's trial, in order to preclude the creation of evidence documenting Thomas's mental deficiencies. According to Silva, such alleged misconduct rendered his trial constitutionally defective under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. Again, we find that Silva has alleged sufficient facts to meet the *Slack* standard for granting a COA. The Supreme Court has held that the suppression of material impeachment evidence, particularly of key state witnesses, can require the reversal of a conviction or the vacating of a sentence. *See Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (holding that impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule); *see also United States v. Mejia-Mesa,* 153 F.3d 925, 928 (9th Cir.1998) (holding that the district court had abused its discretion in denying an evidentiary hearing on a habeas petitioner's *Brady*

claim); *United States v. Brumel-Alvarez,* 991 F.2d 1452, 1461 (9th Cir.1993) ("*Brady* information includes material ... that bears on the credibility of a significant witness in the case.") (internal quotations and citation omitted). Given the possibility that the Lassen County prosecutor may have failed to disclose material impeachment evidence, we grant a COA as to whether the district court abused its discretion in denying an evidentiary hearing.

Finally, Silva argues that trial counsel was ineffective in failing to object to testimony about animals consuming the corpse of Laura Craig. The district court acknowledged that Buckwalter was probably deficient in failing to object on relevance grounds to such testimony at trial, but declined to find Buckwalter ineffective under the prejudice prong of the *Strickland* inquiry. Although we agree with the district court that Silva would be hard-pressed to demonstrate sufficient prejudice from this individual claim to warrant a COA, our cases have also held that cumulative prejudice from trial counsel's deficiencies may amount to sufficient grounds for a finding of ineffectiveness of counsel. *See, e.g., Harris v. Wood,* 64 F.3d 1432, 1438 (9th Cir.1995) (holding that the cumulative impact of multiple deficiencies in defense counsel's performance prejudiced the defendant in a capital trial); *Mak v. Blodgett,* 970 F.2d 614, 622 (9th Cir.1992) ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel affirmance of the district court's grant of habeas corpus as to the sentence of death."). Accordingly, we grant a COA on this issue because we find that with respect to the potential for cumulative prejudice, the petitioner has alleged a sufficient showing of a denial of a constitutional right as to merit consideration of this claim.

In sum, we grant a COA for all of the issues raised in Silva's petition, pursuant to our authority under 28 U.S.C. § 2253(c) and Fed. R.App. P. 22(b), and exercise jurisdiction over the merits of this appeal pursuant to 28 U.S.C. § 2254.[9]

III.

 The district court's decision to deny habeas relief is reviewed de novo. *Santamaria v. Horsley*, 133 F.3d 1242, 1244 (9th Cir.1998) (en banc). In particular, claims alleging ineffective assistance of counsel are mixed questions of law and fact and are reviewed de novo. *Jackson v. Calderon*, 211 F.3d 1148, 1154 (9th Cir. 2000); *Sanders v. Ratelle*, 21 F.3d 1446, 1451 & n. 7 (9th Cir.1994) (citations omitted). To the extent it is necessary to review findings of fact made in the district court, the clearly erroneous standard applies. *Norris v. Risley*, 918 F.2d 828, 830 (9th Cir.1990). Our review for clear error is "significantly deferential," in that we must accept the district court's factual findings absent a "definite and firm conviction that a mistake has been committed." *United States v. Syrax*, 235 F.3d 422, 427 (9th Cir.2000), *cert. denied*, 532 U.S. 988, 121 S.Ct. 1639, 149 L.Ed.2d 498 (2001).

 Although less deference to state court factual findings is required under the pre-AEDPA law which governs this case, such factual findings are nonetheless entitled to a presumption of correctness unless

they are "not fairly supported by the record." *See* 28 U.S.C. § 2254(d)(8) (1996); *Bean v. Calderon*, 163 F.3d 1073, 1087 & n. 3 (9th Cir.1998); *Sanders*, 21 F.3d at 1451. Notably, however, given that Silva's habeas petition was summarily dismissed in his state post-conviction proceedings, the factual basis for these claims was never fully adjudicated and thus fall within the pre-AEDPA § 2254 exceptions to the deference rule.[10]

IV.

 In considering whether to grant habeas relief, federal courts are "limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Bonillas v. Hill*, 134 F.3d 1414, 1417 (9th Cir.1998) (internal quotation marks and citations omitted); *see also* 28 U.S.C. § 2254(a) (1994). "State court judgments of conviction and sentence carry the presumption of finality and legality," and as a result "[i]t is the petitioner's burden to prove his custody is in violation of the Constitution, laws or treaties of the United States." *Snook v. Wood*, 89 F.3d 605, 609 (9th Cir.1996). This burden of proof must be carried by a preponderance of the evidence. *McKenzie v. McCormick*, 27 F.3d 1415, 1419 (9th Cir.1994).

 Separate from the question of whether Silva's petition merits a writ of habeas corpus is whether an evidentiary

---

9. Apart from the COA requirement, all of the issues presented in this case are properly before this court. Put another way, we do not find—and the state does not contend that there are—any issues of procedural default or exhaustion surrounding the substantive claims raised by Silva in this appeal.

10. Specifically, under 28 U.S.C. § 2254(d) (1991), no presumption of correctness applies if a petitioner establishes, *inter alia:*

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

. . . .

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding. . . .

hearing should have been conducted in the district court on two of his claims. As noted earlier, "[i]n habeas corpus proceedings, an evidentiary hearing is required where the petitioner's allegations, if proved, would establish the right to relief." *Campbell*, 18 F.3d at 679.

With respect to Silva's claims of ineffective assistance, the familiar legal standard for evaluating such claims comes from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To obtain habeas relief, a petitioner must satisfy two prongs: deficient performance and prejudice. With respect to the former, a petitioner must carry the burden of demonstrating that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. Such assessment must be made "from counsel's perspective at the time," so as "to eliminate the distorting effects of hindsight." *Id.* at 689, 104 S.Ct. 2052. In assessing trial counsel's performance, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and hence "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* Furthermore, and specifically with respect to the issue of investigative strategy, *Strickland* directs that "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691, 104 S.Ct. 2052.

To establish prejudice, meanwhile, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. As noted earlier, individual deficiencies that may not by themselves meet the *Strickland* prejudice standard may, when considered cumulatively, constitute sufficient prejudice to justify granting the writ. *See Harris*, 64 F.3d at 1438; *Mak*, 970 F.2d at 622.

■ Significantly, the right to effective assistance of counsel applies not just to the guilt phase, but "with equal force at the penalty phase of a bifurcated capital trial." *Clabourne v. Lewis*, 64 F.3d 1373, 1378 (9th Cir.1995) (citations omitted); *see also Mak*, 970 F.2d at 619 ("Because of the potential consequences of deficient performance during capital sentencing, we must be sure not to apply a more lenient standard of performance to the sentencing phase than we apply to the guilt phase of trial"). As stated by the *Strickland* Court: "When a defendant challenges a death sentence ... the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695, 104 S.Ct. 2052.

## V.

### *Penalty Phase Ineffective Assistance*

Silva's principal claim with respect to the penalty phase is that Buckwalter failed to conduct any investigation into his background and, as a result, failed to uncover and present to the jury a raft of potentially compelling mitigating evidence. In particular, Silva contends, *inter alia*, that Buckwalter never contacted Silva's family members or acquaintances from Hawaii; declined to hire an investigator for either phase of the trial; failed to investigate Silva's mental health history in spite of clear indications of mental imbalance at

the time of the trial, including a suicide attempt while in jail; neglected to obtain a presentencing report for an outstanding federal drug conviction, which would have alerted him to Silva's prior criminal and juvenile records and other relevant information about his social history; and failed to obtain prior psychiatric evaluations or provide adequate direction to the lone defense psychiatric expert, Dr. Albert French, including such basic information that Silva faced the death penalty and needed to be evaluated for purposes of defending against a first-degree murder charge.

Buckwalter, for his part, testified in his deposition that Silva threatened to disrupt the trial if Buckwalter contacted his parents, and that this possibility prevented him from even secretly trying to investigate Silva's background, lest Silva somehow find out. Furthermore, Buckwalter averred that he chose to abide by Silva's wishes, in large part because he did not wish to jeopardize the limited amount of trust he had been able to develop with him.

The district court initially found Buckwalter's failure to investigate Silva's background to present "a colorable claim of deficient performance." In addition, it rebuked Buckwalter for deliberately destroying his notes and files. But the district court nonetheless felt obliged to proceed on the basis that "those items are no longer available ... and the Court must make its decision based on the evidence available." It then proceeded to credit, and subsequently place great emphasis on, Buckwalter's claim that Silva had forbidden him to contact his family and friends in Hawaii and threatened to disrupt the trial if he attempted to investigate his background. Quoting from *Jeffries v. Blodgett,* 5 F.3d 1180, 1198 (9th Cir.1993), the court reasoned that "when a defendant preempts his attorney's strategy by insisting that a different defense be followed, no claim of ineffectiveness can be made." Hence, finding that "Buckwalter's failure to investigate ... was entirely due to Silva's own instructions to his lawyer," the court ruled that Buckwalter's performance was not deficient under the first prong of the *Strickland* test and, therefore, did not need to be evaluated for prejudice.

In addition, the district court found that Buckwalter was not deficient in his investigation of and preparation of potential psychiatric defenses. Although the conditions surrounding Dr. French's evaluation of Silva may have been suboptimal, the district court was satisfied that Buckwalter had discharged his duty in that he had consulted Dr. French, received an unfavorable opinion from him with respect to the availability of psychiatric defenses, and relied on that conclusion in deciding to focus his energies elsewhere. Buckwalter had Dr. French examine Silva for competency as well, and Dr. French found no evidence of any mental disorder before trial. Hence the district court concluded that Buckwalter was not deficient in his handling of Dr. French.

Similarly, while the district court found that Buckwalter's failure to obtain the federal presentencing report for Silva's drug conviction "arguably amount[ed] to constitutionally deficient performance," it also held that Silva had "fail[ed] to explain how he was prejudiced by Mr. Buckwalter's failure to thoroughly investigate Silva's criminal history." Thus, the court held that habeas relief on ineffective assistance grounds was again not warranted.

As required under *Strickland,* we analyze Silva's claims first for deficiency and then for prejudice under a de novo standard of review.

### 1. Deficient Performance

For Silva to prevail, he must show that Buckwalter's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. As the Court stated in *Strickland*, trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. Thus, the threshold legal issue with which we are confronted is whether Buckwalter's decision not to hire an investigator and abandon all inquiry into Silva's background was objectively reasonable in light of Silva's alleged directive.

Antecedent to this legal determination is a critical factual dispute over exactly what Silva told Buckwalter, and what Buckwalter did in response. In his deposition, Buckwalter testified that Silva repeatedly and insistently told him not to *contact* any family members or friends or to otherwise conduct any investigation into his background, or else Silva would do something in front of the jury to "make them hate him" and ruin the trial. Thus, as the state argues, "Petitioner did not just tell his attorney not to call his parents or friends from Hawaii [as witnesses]—he told Buckwalter not to even contact them."

For his part, Silva admits telling Buckwalter that he "did not want him to use [Silva's parents] as witnesses and ... prefer[red] that he left them alone," but claims that he never ordered Buckwalter to refrain from contacting them or threatened to alienate the jury if Buckwalter did not heed his wishes. Indeed, Silva's own account of his instructions to Buckwalter evinces an aversion to having his parents called as witnesses, but less resistance to having them contacted for informational purposes. Furthermore, in his declaration, Silva claims that he never forbade Buckwalter from contacting his siblings and friends or from otherwise investigating his background. Silva also maintains that Buckwalter did not bring up the need to investigate his background until "a very late point in the case"; never explained to him that his parents could be used as sources of information without having to testify themselves; and never informed him that the trial would be bifurcated into two phases, much less the potential import that mitigating evidence might have in the penalty phase.

As noted earlier, the district court credited Buckwalter's version of events in spite of his destruction of his trial notes and files. Accordingly, the court construed Silva's instructions as justifying Buckwalter's total failure to investigate Silva's background, in that Buckwalter "reasonably believed" that refraining from such investigation represented the prudent course.

We disagree with the district court. While it is true that "the competence of a lawyer's tactical and strategic decision ... is entitled to an additional measure of deference if he acts in conformity with the client's wishes," *Summerlin v. Stewart*, 267 F.3d 926, 948 (9th Cir.2001), counsel's duty to *investigate* mitigating evidence is neither entirely removed nor substantially alleviated by his client's direction not to *call* particular witnesses to the stand. Furthermore, a lawyer who abandons investigation into mitigating evidence in a capital case at the direction of his client must at least have adequately informed his client of the potential consequences of that decision and must be assured that his client has made "informed and knowing" judgment. *See Jeffries*, 5 F.3d at 1198 (finding no deficient performance where counsel was prepared to present mitigating evidence but precluded from doing so by client's informed and knowing decision not to include it); *see also Wallace v. Stewart*, 184 F.3d 1112,

1117 (9th Cir.1999) ("[I]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase.") (quoting *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir.1999)).

In *Summerlin*, this Circuit held that defense counsel's decision at the behest of his client to present a psychological evaluation during the penalty phase regarding the client's history of abuse and mental illness, without the support of testimony from the psychologist who made the evaluation, did not constitute deficient performance. 267 F.3d at 947–48. Summerlin had declared in open court, in response to an inquiry by the trial judge, that he understood the consequences of his decision. *Id.* at 945. The present case, however, differs in two crucial respects: First, this case concerns Buckwalter's decision not to investigate Mr. Silva's personal history in order to ascertain mitigating evidence rather than a plausible tactical decision to provide documentary mitigating evidence instead of calling a witness, whose live testimony may have been unpredictable. Second, a factual dispute exists as to whether Mr. Silva in fact directed Buckwalter not to perform an investigation into his personal history, and whether any such direction that Silva may have given was in fact knowing and informed. *Cf. Landrigan v. Stewart*, 272 F.3d 1221, 1227–29 (9th Cir.2001) (finding no ineffective assistance of counsel where counsel's decision not to present mitigating evidence at the penalty phase was influenced by the client's aggressive reaction to a previous attempt to do so and use of this evidence was unlikely to have produced a different result).

The district court's conclusion that Mr. Silva had clearly directed Buckwalter not to investigate his family background is not fairly supported by evidence in the record. In two separate declarations signed and executed in 1987 and 1989, respectively—that are a part of the district court record but not discussed by the court in its order—Buckwalter testified that "[i]n the course of preparing for the penalty trial ... I discussed with Mr. Silva the possibility of calling his parents *as witnesses* for purposes of presenting evidence in mitigation. Mr. Silva advised me that it was his wish that his parents not be called by the defense in connection with his case. I therefore did not *contact* Mr. Silva's parents and did not offer them as witnesses ...." (emphasis added). Such remarks apparently seek to justify Buckwalter's total abandonment of the investigation on the ground that Silva's parents were not to be called as witnesses; as a result, these remarks fail to distinguish between contacting the parents for informational purposes and having them testify at trial. Furthermore, the remarks also fail to distinguish between contacting Silva's parents and contacting other family members and friends, or investigating other aspects of Silva's past such as his psychiatric history, criminal and incarceration records, and drug usage. Indeed, other evidence that might have been useful in constructing a mental state defense, such as Silva's federal presentencing report, prior psychiatric evaluations, incarceration records, and drug usage history, were readily available and did not even require contacting Silva's family or friends from back home. Even taking Buckwalter's words at face value, then, there are subtle but highly significant discrepancies as to precisely what instructions Silva gave him.

Accordingly, we find Buckwalter's justification for foregoing the investigation to be suspect on a number of grounds. From our review of the record, it appears that Silva's directive, while possibly somewhat ambiguous, only prevented Buckwalter from calling his parents as witnesses at trial. The record does not support Buck-

walter's claim that Silva's demand precluded him from investigating any and all aspects of his background, including his criminal and psychiatric history as well as his family upbringing. Elsewhere, Buckwalter's own deposition testimony tends to make his position sound rather implausible, if not disingenuous; for example, with respect to the presentencing report, Buckwalter admits that he was unaware that Silva had been sentenced on a drug charge while awaiting trial, or that he was removed from the state facility in Susanville for the sentencing hearing in federal district court. We believe that this sort of negligence, rather than any "tactical" decision not to investigate Silva's past, accounted for Buckwalter's failure to obtain the report or to gather other information on Silva's background. In sum, Silva's directive did not automatically require foregoing all inquiry into his past. We therefore hold that Buckwalter's abandonment of the investigation was unreasonable under the circumstances.

Our holding is supported by the 1980 American Bar Association ("ABA") Standards for Criminal Justice [11] in effect at the time of the trial. While not directly addressing a situation where a client purportedly seeks to prohibit an attorney from investigating his background, these guidelines suggest that a lawyer's duty to investigate is virtually absolute, regardless of a client's expressed wishes. *See* 1 ABA Standards for Criminal Justice 4–4.1, cmt. at 4–55 (2d ed.1980); *cf. Jeffries*, 5 F.3d at 1198 (acknowledging that while the ABA standards "offer[ ] some support to Jeffries' contention that his counsel should have presented evidence in mitigation despite his client's wishes to the contrary," they "serve only as a 'guide' for determining whether an attorney's performance is adequate").

To be sure, *Strickland* advises us that prevailing professional norms of practice, such as those reflected in manuals, "are guides to determining what is reasonable, but they are only guides." 466 U.S. at 688, 104 S.Ct. 2052. "More specific guidelines are not appropriate," *id.*, given that "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688–89, 104 S.Ct. 2052. Hence, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. We nonetheless find it significant that these professional standards were cited approvingly by the Supreme Court in the recent *Williams* decision, with respect to the Court's determination in that case "that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." 529 U.S. at 396, 120 S.Ct. 1495.

Silva further contends that Buckwalter was wrong to accept his directive so readily without attempting to dissuade or fully educate him about the ramifications of his decision, and without seeking professional

---

**11.** ABA Standards for Criminal Justice 4–4.1 (2d ed.1980) reads as follows:

Duty to investigate

It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

or ethical guidance and advice from outside parties. Buckwalter met only briefly with Silva on two or three occasions before the trial to discuss the need to gather evidence about his background, and he apparently never made a serious attempt to educate Silva about the consequences of his decision.[12] We hold that such conduct was objectively unreasonable under the circumstances and again amounted to deficient performance on Buckwalter's part.

Our holding is amply supported by both Supreme Court and circuit precedent. As mentioned earlier, in *Williams,* the Court recently held that a habeas petitioner was denied his right to effective assistance of counsel when his attorneys failed to investigate and present substantial mitigating evidence during the penalty phase of his capital murder trial. The Court reached this conclusion in spite of the respondent's claim that trial counsel reasonably chose to emphasize the fact that the petitioner had voluntarily confessed to the murder in question, instead of presenting other mitigating evidence.

*Williams* involved a Virginia man who was incarcerated on an unrelated charge and then spontaneously confessed to an unsolved murder. He was convicted of robbery and capital murder by a jury, and his trial counsel offered little meaningful mitigating evidence in his behalf during the ensuing sentencing phase of the trial.[13] *See* 529 U.S. at 368–69, 120 S.Ct. 1495. Although the prosecution presented evidence of Williams' long criminal history and other aggravating factors, Williams'

trial counsel chose to rest on the fact Williams had turned himself in voluntarily for crimes that the police would otherwise not have solved. *Id.* at 373, 120 S.Ct. 1495. The jury subsequently returned a sentence of death.

Applying the *Strickland* framework, the Court concluded that such performance was constitutionally deficient. Noting that counsel did not begin to prepare for the sentencing phase until one week before the trial, the Court faulted counsel for failing "to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." *Id.* at 395, 120 S.Ct. 1495. Included in such records was evidence that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings; that Williams had been severely and repeatedly beaten by his father; and that he had endured a stint in an abusive foster home while in the custody of the social services bureau during his parents' prison term. *Id.* Counsel also failed to introduce available evidence that Williams suffered from borderline mental retardation (resulting in a failure to advance beyond the sixth grade in school), and had exhibited exemplary behavior while in prison. *Id.* at 396, 120 S.Ct. 1495. Taken together, these omissions amounted to constitutionally deficient performance in that "the failure to introduce the comparatively voluminous amount of evidence that did

12. Silva repeatedly complained about Buckwalter's representation, including the fact that he rarely visited him in prison, and tried to have Buckwalter removed from the case.

13. Williams' trial counsel presented three lay witnesses during the sentencing phase, consisting of Williams' mother and two neighbors. They briefly described Williams as a

"nice boy" and not a violent person. A fourth witness, a psychiatrist, did little more than relate Williams' statement that he had removed the bullets from his gun during one of his earlier robberies so as not to injure anyone. *Williams v. Taylor,* 529 U.S. 362, 369, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citation omitted).

speak in Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession." *Id.* In sum, such omissions "clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." *Id.* at 396, 120 S.Ct. 1495 (citing ABA Standards for Criminal Justice 4–4.1).

It is equally clear from our circuit precedent that an attorney's failure to investigate, during either the guilt phase or the sentencing phase of a capital trial, can amount to constitutionally deficient performance. We recently held, in *Ainsworth v. Woodford,* 268 F.3d 868 (2001), that defense counsel's penalty phase performance was constitutionally deficient where counsel "failed to adequately investigate, develop, and present mitigating evidence to the jury even though the issue before the jury was whether [the defendant] would live or die." *Id.* at 874. The district court granted Ainsworth's habeas petition regarding claims of ineffective assistance during the penalty phase of his capital trial for the murder, rape, and robbery of Seng Huynh. This court affirmed the district court's ruling. Ainsworth's counsel admitted in deposition testimony that he had "abdicated the investigation of Ainsworth's psychosocial history" to one of the defendant's relatives. *Id.* Counsel also failed to obtain documents containing crucial mitigating evidence as well as the police reports produced by the prosecution to make its case at sentencing. *Id.* Mitigating evidence available through the ignored documents and unadduced witness testimony included evidence of Ainsworth's "troubled childhood, his history of substance abuse, and his mental and emotional problems." *Id.* at 875. In affirming the ruling of the district court, we held that defense counsel's deficient performance prevented the jury from having knowledge of the "development of the person who committed the crime" and deprived Ainsworth of "the individualized sentence required by the Constitution." *Id.* at 878.

In *Bloom v. Calderon,* 132 F.3d 1267 (9th Cir.1997), a case with several important parallels to this one, we also found that a trial attorney's failure to obtain and prepare a psychiatric witness was constitutionally deficient. *Bloom* involved "yet another case of severe childhood abuse ending in tragedy," *id.* at 1269, in which a son killed his father, stepmother, and stepsister. Bloom's defense was based in part on the theory that he lacked the necessary mental capacity for premeditation, malice, and the intent to kill. *Id.* at 1270. He also attempted suicide while awaiting trial. *Id.* at 1271. Nonetheless, his trial counsel did nothing to procure the services of a psychiatric expert until a few days before trial, and then failed to provide him with necessary and available data which would have assisted the expert in his subsequent evaluation and trial testimony— including an outline of the theory of defense. *Id.* at 1270. As a result, the psychiatrist, who constituted the sole defense expert witness, produced a severely damaging psychiatric report which the prosecution used effectively in cross-examination and in closing argument. *Id.* at 1271.

We found that such performance was constitutionally deficient, in that counsel had failed to furnish the expert with easily available information such as a social history, a prior psychiatric report, and jail medical records. *Id.* at 1277. Although we acknowledged that under *Hendricks v. Calderon,* 70 F.3d 1032 (9th Cir.1995), "counsel does not have a duty 'to acquire sufficient background material on which an expert can base reliable psychiatric conclusions independent of any request for information from an expert,'" we concluded that the record did not support the district court's finding that the expert had not

requested such information.[14] *Bloom,* 132 F.3d at 1277 (quoting *Hendricks,* 70 F.3d at 1038). Indeed, we noted that Bloom's trial counsel never claimed that the expert failed to request such information, and looked with skepticism on counsel's repeated averrals that he could not recall details of his representation during the evidentiary hearing.[15] *Id.* As a result, we found counsel's performance to be deficient.

Similarly, in *Hendricks,* we found trial counsel ineffective in failing to investigate and present mental health evidence in mitigation during the penalty phase. Although we did not find Hendricks' trial counsel's performance deficient in the guilt phase—given that he conducted adequate investigation, hired two mental health experts to look into mental defenses, and reasonably concluded that none were available, *see* 70 F.3d at 1036—we faulted counsel for failing to conduct an investigation directed at developing mitigating evidence in the penalty phase, and concluded that there was no evidence that counsel "made a strategic choice that obviated the need to investigate," *id.* at 1043. Instead, counsel decided to plead for mercy, not because presenting mitigating evidence would open the door to damaging rebuttal evidence, but because pleading for mercy was the strategy employed in the only other penalty hearing in which counsel had participated. *Id.* To be sure, "[b]egging for mercy is not incompetence per se .... However, where counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condi-

tion as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance." *Id.*

Our holdings in *Ainsworth, Bloom,* and *Hendricks* are illustrative but not exhaustive of the breadth of a criminal defendant's constitutional protection against his attorney's failure to investigate mitigating evidence when defending his client against a capital sentence. *See also, e.g., Jackson v. Calderon,* 211 F.3d 1148, 1162 (9th Cir. 2000) (holding that by "failing to prepare and investigate for a penalty defense, counsel clearly fell below the requisite standard of competence") (citation omitted); *Bean,* 163 F.3d at 1078–89 (finding trial counsel ineffective for, among other things, failing to investigate penalty-phase issues and furnish mental health experts with necessary information to prepare for their testimony); *Deutscher v. Whitley,* 884 F.2d 1152, 1159–62 (9th Cir.1989) (holding that trial counsel's failure to investigate and present mitigating evidence relating to Deutscher's past psychiatric treatment or family background constituted ineffective assistance at the penalty phase), *aff'd sub nom. Deutscher v. Angelone,* 16 F.3d 981 (9th Cir.1994); *Evans v. Lewis,* 855 F.2d 631, 636 (9th Cir.1988) (finding ineffective assistance where in spite of documents plainly indicating that Evans had a history of mental problems, including the defendant's California conviction records and a presentencing report, "counsel conducted no investigation to ascertain the extent of any possible mental impairment" and subsequently presented

---

**14.** Likewise, the record is unclear here as to what exactly Dr. French requested from Buckwalter in terms of records, documentation, and social history. Buckwalter repeatedly professed an inability to recall such details during his deposition testimony, and his destruction of his notes and files do not help in this regard.

**15.** Similarly, Buckwalter never testified that Dr. French failed to request the standard documents and background materials for a psychiatric evaluation, but instead professed that he could not remember.

no mitigating evidence during the penalty phase); *cf. Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir.1994) (holding that trial counsel was deficient during the guilt phase for "fail[ing] to conduct even the minimal investigation that would have enabled him to come to an informed decision about what defense to offer," and that "[d]escribing [counsel]'s conduct as 'strategic' strips that term of all substance").

The state cites a number of cases in support of its position that Buckwalter's performance was not deficient under the circumstances. *See Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Babbitt v. Calderon*, 151 F.3d 1170 (9th Cir.1998); *Coleman v. Calderon*, 150 F.3d 1105 (9th Cir.1998); *Campbell v. Kincheloe*, 829 F.2d 1453 (9th Cir.1987). In all of these cases, the court declined to find ineffective assistance in the context of an attorney's failure to present guilt- or penalty-phase evidence. Critically, however, in each of these cases, trial counsel had already investigated and prepared such evidence beforehand so as to make an informed decision about trial strategy, and had reasonable grounds for electing not to present such evidence at trial.

In *Burger*, for example, the Supreme Court held that a reasonable basis existed for counsel's decision not to develop and present, at either of two sentencing hearings, evidence of his client's troubled family background. Burger was convicted of robbing and murdering a cab driver while stationed in the army in Georgia. Burger's trial counsel decided for a variety of reasons that it would be unwise to present evidence of his client's unfortunate childhood in mitigation, since potential witnesses such as family members or friends could also testify to damaging facts about his client. 483 U.S. at 790–91, 107 S.Ct.

3114. Counsel believed that it would also be unwise to put the defendant himself on the witness stand, since psychological reports indicated that he never expressed any remorse about his crime and might even appear to a jury to enjoy discussing or even bragging about the murder. *Id.* at 791, 107 S.Ct. 3114.

Significantly, however, in contrast to Silva's case, Burger's counsel had conducted *some* basic investigation prior to reaching the decision not to look into his client's family history any further. Based on psychologists' reports and interviews with family members and friends, Burger's attorney "made the reasonable decision that his client's interest would not be served by presenting this type of evidence." *Id.* at 790–91, 107 S.Ct. 3114. Although the Court acknowledged that "[t]he record at the habeas corpus hearing does suggest that [counsel] could well have made a more thorough investigation than he did," *id.* at 794, 107 S.Ct. 3114, "counsel's decision not to mount an *all-out* investigation into petitioner's background in search of mitigating circumstances was supported by reasonable professional judgment," *id.* (emphasis added). In sum, "[w]e have decided that 'strategic choices made after *less than complete* investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on the investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052) (emphasis added). Here, no such judgment was—or could have been—made.

In *Darden*, meanwhile, the Court held that trial counsel's decision to forego the presentation of mitigating evidence in the penalty phase and rely instead on a simple plea of mercy was not constitutionally deficient, in that it rested on a reasonable determination that to try and present mitigating evidence would open the petitioner up to damaging rebuttal testimony. *Dar-*

*den,* 477 U.S. at 186–87, 106 S.Ct. 2464. Citing the *Strickland* adage that "[j]udicial scrutiny of counsel's performance must be highly deferential," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, the Court elaborated at length on the reasons why Darden's attorney plausibly elected not to present a variety of potential mitigating evidence. *Darden,* 477 U.S. at 184–87, 106 S.Ct. 2464. Furthermore, in contrast to Silva's case, the Court noted that Darden's claim that his attorney had failed adequately to investigate and prepare for mitigation was "without merit," in that Darden's trial counsel "engaged in extensive preparation prior to trial, in a manner that included preparation for sentencing." *Id.* at 184, 106 S.Ct. 2464; *cf. Coleman,* 150 F.3d at 1113–14 (holding that Coleman's trial counsel did not fail to properly investigate physical evidence implicating his client during the guilt phase).

Within this circuit, *Babbitt* represents another instance where a court upheld the competence of trial counsel against charges that they failed to unearth and present relevant evidence during both the guilt and penalty phases of a capital trial. *Babbitt* involved a habeas petitioner's claim that trial counsel had failed to minimally investigate and present evidence pertinent to a Post Traumatic Stress Disorder ("PTSD") defense, as well as related evidence about Babbitt's life and family history. 151 F.3d at 1174. We refused to grant habeas relief on the grounds that counsel's performance was neither deficient nor prejudicial. *Id.* Once again, however, in contrast to the present case, we emphasized that "counsel did far more than a mere cursory investigation." *Id.* at 1176. Quoting from *Matthews v. Evatt,* 105 F.3d 907, 920 (4th Cir.1997), we stated that " 'counsel is not deficient for failing to find mitigating evidence if, *after a reasonable investigation,* nothing has put the counsel on notice of the existence of that

evidence.' " *Babbitt,* 151 F.3d at 1174 (emphasis added). No such investigation occurred here.

The case that on the surface appears most helpful to the state is *Campbell v. Kincheloe,* 829 F.2d 1453 (9th Cir.1987). *Campbell* involved the habeas appeal of an inmate convicted of three counts of aggravated murder and sentenced to death. During the pre-trial investigation, Campbell "specifically requested his attorneys not to contact members of his family." *Id.* at 1463. Drawing from *Strickland*'s admonition that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," 466 U.S. at 691, 104 S.Ct. 2052, we held that given this demand, Campbell's trial counsel was not deficient in abiding by Campbell's wishes. *Campbell,* 829 F.2d at 1463. Thus, *Campbell* seems at first glance to justify Buckwalter's actions in abandoning his investigation of Silva's background.

However, *Campbell* did not pronounce a per se rule that a client's wishes require or even justify the abridgment of trial counsel's investigation; rather, "[t]he client's wishes *are not to be ignored entirely.*" *Id.* (emphasis added). This hardly constitutes a bright-line command that clients' wishes are to be paramount in this area. Moreover, critically, we again found that "[t]he record indicates ... that Campbell's attorneys conducted a reasonable investigation" prior to acquiescing in their client's wishes. *Id.* In contrast to Buckwalter, Campbell's trial counsel was therefore aware of the potential mitigating factors which could have been introduced during sentencing, such as the fact that Campbell's father was an alcoholic; that Campbell had been the victim of child abuse; that he had a history of medical and substance abuse problems; and that he may have attempted suicide on one occasion. *Id.*

Indeed, in his habeas appeal, "Campbell [did] not suggest any potential mitigating evidence that could have been uncovered through a more thorough investigation." *Id.* Instead, Campbell's refusal to grant his attorneys access to interview his family and friends "w[as] ... consistent with the professional judgment of his attorneys that such interviews were unnecessary and would not have made any difference in the context of the case." *Id.* For under the prevailing laws of Washington state, if the defense chose not to put on any mitigating evidence, the prosecution was constrained to producing only such aggravating evidence as was related to Campbell's prior criminal record. Given the strong possibility that the introduction of certain types of mitigating evidence by the defense could lead to damaging rebuttal evidence of Campbell's violent past and sordid criminal record, his counsel exercised reasonable judgment in refraining from introducing any evidence whatsoever during the penalty phase. *Id.* at 1463–64.

Such facts are noticeably absent here. Buckwalter conducted no investigation whatsoever into Silva's past and also failed to even minimally assist in the preparation of possible mental defenses related to psychiatric disorders or substance abuse. His trial "strategy" was based entirely on an overbroad acquiescence in his client's demand that he refrain from calling his parents as witnesses.

As in *Williams*, where trial counsel attempted to characterize his failure to investigate as a tactical decision to focus on the defendant's voluntary confession, Buckwalter's decision to altogether abandon the investigation cannot be justified as a legitimate trial strategy. As we noted in *United States v. Span,* 75 F.3d 1383, 1389 (9th Cir.1996), an attorney's performance is not immunized from Sixth Amendment challenges simply by attaching to it the label of "trial strategy." Rather, "[c]ertain defense strategies may be so ill-chosen that they may render counsel's overall representation constitutionally defective." *United States v. Tucker,* 716 F.2d 576, 586 (9th Cir.1983). While it is true that, according to *Strickland,* "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," and that "what investigation decisions are reasonable depends critically on such information," Buckwalter's blanket decision to forego all investigation was patently deficient for the reasons elaborated above.[16]

■ Ultimately, then, we conclude that Buckwalter's abandonment of the investigation into Silva's background—including his family, criminal, substance abuse, and mental health history—was unreasonable in that it did not meet professional norms prevailing at the time of Silva's trial, and that it therefore amounted to constitutionally deficient performance under the totality of the circumstances. "[C]ounsel must, at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client," and "[a] lawyer has a duty to investigate what information ... potential eyewitnesses possess[ ], even if he later decide[s] not to put them on the stand." *Sanders,* 21 F.3d at 1456–57 (internal quo-

---

**16.** The principal case cited by the district court in finding that Buckwalter was not deficient for failing to investigate—*Jeffries v. Blodgett,* 5 F.3d 1180 (9th Cir.1993)—did not implicate counsel's basic duty to investigate. Instead, on the eve of the penalty phase in that case (and after all investigation and prep-aration had been completed), the defendant made an "informed and knowing" decision not to put on any mitigating evidence over the objections of his trial counsel. *Id.* at 1197. The court therefore found that counsel's performance had not been deficient and refused to grant habeas relief on those grounds. *Id.*

tation marks and citations omitted). Buckwalter could not make a reasoned tactical decision about the trial precisely because "[c]ounsel did not even know what evidence was available." *Deutscher*, 884 F.2d at 1160. As we stated in *Sanders*, "[i]neffectiveness is generally clear in the context of complete failure to investigate because counsel *can hardly be said to have made a strategic choice when s/he [sic] has not yet obtained the facts on which such a decision could be made.*" *Sanders*, 21 F.3d at 1457 (quoting *United States v. Gray*, 878 F.2d 702, 711 (3d Cir.1989)).

Put another way, even if he could not call Silva's parents as witnesses, Buckwalter still had a duty to determine what evidence was out there in mitigation in order to make an informed decision as to how to best represent his client. Indeed, if a client forecloses certain avenues of investigation, it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of information and evidence, especially in the context of a capital murder trial. In addition, Buckwalter had a concomitant duty to try to educate or dissuade Silva about the consequences of his actions—neither of which he attempted to do.

*2. Prejudice*

■ *Having found Buckwalter's performance deficient, we* now analyze it for prejudice. As we stated in *Deutscher:*

"Although we do not presume prejudice in a case such as this, we must be especially cautious in protecting a defendant's right to effective counsel at a capital sentencing hearing." 884 F.2d at 1161; *see also Coleman*, 210 F.3d at 1050 ("Because a death sentence is qualitatively different from other forms of punishment, there is a greater need for reliability in determining whether it is appropriate in a particular case.") (citations omitted).

As discussed above, because of Buckwalter's complete abandonment of the investigation, he failed to present substantial and potentially compelling mitigating evidence during the penalty phase of the trial relating to Silva's childhood, mental illnesses, organic brain disorders, and substance abuse.[17] We find that especially given the prosecution's emphasis on the utter lack of mitigating evidence during the penalty phase,[18] as well as the jury's consideration of three improper special circumstances, Buckwalter's failure to investigate was profoundly prejudicial.

In the *Williams* case, the Court found that Williams was prejudiced by trial counsel's failure to investigate, in that when added to the voluntary nature of his confessions, the unpresented evidence regarding Williams' childhood "might well have influenced the jury's appraisal of his moral culpability." 529 U.S. at 398, 120 S.Ct. 1495. Faulting the Virginia Supreme Court for failing to reweigh the totality of

**17.** For purposes of the limited evidentiary hearing, Silva's habeas counsel submitted evidence from a psychiatric expert and social worker that, among other things, Silva had been severely abused and neglected as a child by alcoholic and impoverished parents; that he may suffer from organic brain disorders resulting from Fetal Alcohol Syndrome; that he likely suffers from Post–Traumatic Stress Disorder; that he suffered from a hyperactive form of Attention Deficit Disorder that led to repeated failures in school and eventual self-medication through the use of drugs; and

that at the time of the crime, he was probably suffering from amphetamine-induced organic mental disorders and withdrawal symptoms.

In addition, Silva's present counsel submitted affidavits in the District Court from Silva's parents and siblings to the effect that, had they been notified, they would have been willing to testify as lay witnesses to many of these facts at Silva's trial.

**18.** *See People v. Silva*, 45 Cal.3d 604, 634, 247 Cal.Rptr. 573, 754 P.2d 1070 (Cal.1988).

the available mitigation evidence that had been adduced at trial and in the state habeas proceeding against the evidence in aggravation, the Court found that counsel's deficiencies "raised 'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence." *Id.* at 399, 120 S.Ct. 1495.

Our recent decision in *Jackson v. Calderon*, 211 F.3d 1148 (9th Cir.2000), offers useful parallels with respect to evaluating the prejudice that may have resulted from Buckwalter's failure to investigate and prepare family history, psychiatric and drug-use evidence for the penalty phase. Jackson was convicted in California of first-degree murder and sentenced to death for killing a police officer while under the influence of PCP. Jackson's trial counsel invested only two hours of investigation for the penalty phase before the trial began, and did not ask for a continuance because he purportedly never expected the trial to reach the penalty phase. *Id.* at 1161–62. Notably, as a result of such deficient representation, the defense was unable to present any medical testimony during the penalty phase, nor prepare evidence regarding Jackson's addiction to PCP and the consequences of such addiction. *Id.* at 1161–63. We held that the lack of such testimony was highly prejudicial, since one of the primary factors to be considered in mitigation was Jackson's clouded mental condition brought on by drug use. *Id.* at 1163. In addition, we found that counsel's failure to investigate and present substantial mitigating evidence from the petitioner's social history was prejudicial; a report presented by Dr. Jay Jackman [19] during Jackson's post-con-

viction proceedings—which documented Jackson's history of child abuse, neglect, family instability, and mental illness— "presented a very different picture of Jackson than any the jury was allowed to consider." *Id.*

Similarly, in *Bean v. Calderon*, 163 F.3d 1073 (9th Cir.1998), we held that the petitioner was prejudiced by his trial counsel's deficient performance during the penalty phase. *Bean* involved a death row inmate's contention that, among other things, his trial counsel was incompetent in failing to prepare and furnish necessary information (such as the defendant's social, medical, and educational history, and materials relating to the prosecution's case against Bean) to two mental health experts that counsel had retained before trial. *Id.* at 1078–79. As a result, the experts were unable to definitively opine as to whether Bean suffered from brain damage and other mental disorders. We found that such omissions were sufficiently prejudicial to warrant vacating Bean's sentence. Although the defense did end up putting on the two expert witnesses, "the experts' lack of preparation and the limited informational foundation for their conclusions severely undercut their utility to Bean's penalty-phase defense." *Id.* at 1080–81. Indeed, "the family portrait painted at the federal habeas hearing was far different" from that depicted at trial, as "[t]he jury which committed Bean to death had no knowledge of the indisputably sadistic treatment Bean received as a child, including repeated beatings which left a permanent indentation in his head." *Id.* at 1081. For these reasons, we held that trial counsel's deficiencies undermined confidence in the death sentence. *See also Clabourne v. Lewis*, 64 F.3d 1373, 1385–87 (9th Cir.

---

**19.** Dr. Jackman is also the psychiatrist engaged by Silva's habeas counsel in this appeal.

1995) (finding trial counsel failed to provide expert witnesses with materials they needed to provide an accurate profile of the defendant's mental health, and that such "deficient performance was decidedly prejudicial").

As in *Bean*, here it is important to emphasize that in spite of the undeniably horrific circumstances surrounding the deaths of Thorpe and Craig, "this is not a case in which a death sentence was inevitable because of the enormity of the aggravating circumstances." *Bean*, 163 F.3d at 1081. Although the jury found true four special circumstances, three of these were subsequently invalidated by the California Supreme Court. Furthermore, although comparisons are inherently problematic between trials of accomplices, Joseph Shelton received a sentence of life without parole at his trial (which was later reduced to life imprisonment on direct appeal), even though he was convicted of both murders. *Cf. Mak*, 970 F.2d at 621 ("Nothing in *Strickland* suggests that a proportionality review is inappropriate when considering prejudicial effect. . . ."). For all these

reasons, we conclude that the above-mentioned deficiencies in Buckwalter's performance were sufficiently prejudicial to "undermine confidence in the outcome" of the penalty phase of Silva's trial. In other words, we find that it is reasonably likely that the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 694, 695, 104 S.Ct. 2052.

Our conclusion as to prejudice is bolstered by the fact that during their deliberations in the penalty phase, the jurors sought an explanation from the trial judge as to the meaning of "life without parole." As noted earlier, they sent two questions to the judge: (1) Does anyone have the authority to override the penalty decided by this jury?; and (2) Does life in prison without possibility of parole mean just that, or is parole possible at some future date? The judge referred them back to the jury instructions, explaining that he was unable under the law to answer either question.[20] These questions suggest that a death sentence for Silva was not a fore-

---

**20.** In *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the U.S. Supreme Court held that a trial judge commits reversible error if he or she fails to instruct the jury on the meaning of "life without parole" when the prosecution argues future dangerousness. As the *Simmons* Court stated, "[t]he Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.'" *Id.* at 161, 114 S.Ct. 2187 (citation omitted). The Court recently reaffirmed this ruling in *Kelly v. South Carolina*, 534 U.S. 246, 122 S.Ct. 726, 735–36, 151 L.Ed.2d 670 (2002), holding that the trial judge's duty "to give instructions sufficient to explain the law" obtains with respect to the term "life without parole" even if the jury has made no specific inquiry into the meaning of that legal term. The holdings of *Simmons* and *Kelly* cannot be applied to Silva's case because they are precluded by the doctrine of

*Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (stating that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules were announced"). *See also O'Dell v. Netherland*, 521 U.S. 151, 167, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997) (holding that the *Simmons* rule does not constitute an exception to the ordinary non-retroactivity of new constitutional rules under *Teague* ). Nevertheless, we find *Simmons* and *Kelly* to be relevant to our analysis, insofar as they indicate the seriousness of the prejudice that may have arisen in conjunction with Buckwalter's deficient performance at trial. The trial judge's refusal to provide additional instruction when requested by the jury may indeed have served to compound the effect of Buckwalter's deficient performance.

gone conclusion, especially given that the jurors' only task at that point was to decide between a sentence of life without parole and death.[21] Indeed, one of the juror declarations in the record indicates that it took several ballots before a verdict in favor of the death penalty was reached, and that "[t]o the best of my recollection" at least some of the jurors were initially leaning towards a verdict of life without parole.

■ In sum, we find that in addition to being constitutionally deficient, as elaborated above, Buckwalter's performance during the penalty phase was highly prejudicial. Even in light of Silva's directive that his parents not be called as witnesses, Buckwalter's failure to investigate Silva's background and to prepare evidence relating to his family history, mental health, and substance abuse problems resulted in an egregious failure to uncover and present a raft of potentially compelling mitigating evidence. Such performance violated norms of reasonableness prevailing at the time of Silva's trial and substantially undermines our confidence in the results of the penalty phase.[22]

## VI.

### Guilt Phase Ineffectiveness

Silva also contends that Buckwalter rendered ineffective assistance during the guilt phase of the trial. We reject this claim, however, because we believe that trial counsel's performance, while far from ideal, nonetheless met minimum standards of reasonableness when viewed at the time of the trial. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052. As a result, we hold that Buckwalter's representation was not deficient during the guilt phase.[23]

### 1. Failure to investigate and present a mental defense

■ As in the penalty phase, Silva contends that Buckwalter failed to investigate his personal, psychiatric and substance abuse history in spite of ample signs of mental illness and narcotics convictions. In addition, Silva argues that Buckwalter provided little guidance or information to the defense's psychiatric expert, Dr. French. As a result, Silva claims that Buckwalter's deficient performance prevented him from introducing evidence about his mental state at the time of the

**21.** Silva contends that during the penalty phase deliberations, one juror told the others that he knew, based upon what he had seen in the news media, that a verdict of "life without parole" was misleading because prisoners could later be released for good behavior. In support of this claim, Silva offers declarations from three jurors, including one from the purported conveyor of the improper information. Calling the claim "purely conjecture," the district court dismissed it without a hearing. The court held that Silva could point to no facts or circumstances in the record to prove that the jurors' uncertainty about the term "life without parole" substantially affected their ability to reach a proper verdict. In light of our decision to grant relief on other grounds with respect to the penalty phase, we need not consider whether the district court abused its discretion in refusing to grant an evidentiary hearing on this matter.

**22.** In light of our conclusion that Buckwalter's failure to investigate by itself amounted to constitutionally ineffective assistance, we need not consider the cumulative prejudicial effects of his other deficiencies. Cf. Harris v. Wood, 64 F.3d 1432, 1439 (9th Cir.1995) ("By finding cumulative prejudice, we obviate the need to analyze the individual prejudicial effect of each deficiency. But by no means do we rule out that some of the deficiencies were individually prejudicial.") (citation omitted).

**23.** Because we find that Buckwalter's performance was not deficient, we need not consider whether it was prejudicial under the second prong of the Strickland inquiry. See Strickland, 466 U.S. at 697, 104 S.Ct. 2052.

crimes as a defense to the first-degree murder charge, specifically with respect to his ability to form "willful, deliberate, and premeditated" intent as required under California law.

Unlike the penalty phase, however, where Buckwalter's negligence in failing to advise Dr. French that the prosecutor was seeking the death penalty or that Silva needed to be evaluated for penalty phase purposes closed off an entire source of information about potential mitigating evidence, we find in the context of the guilt phase that Buckwalter adequately discharged his responsibilities. Although Buckwalter certainly could have done more to prepare Dr. French and to look into Silva's criminal substance abuse and mental health history, we believe that he met the constitutional minimum in that he engaged and consulted Dr. French, received an unfavorable opinion from him with respect to the availability of psychiatric defenses, and reasonably relied on that conclusion to focus his energies elsewhere. Hence, Buckwalter obtained sufficient information from Dr. French about the viability of mental defenses during the guilt phase to make an informed decision about

trial strategy. Put another way, given that mental defenses to charges of premeditated murder are rarely successful during the guilt phase, it was not unreasonable for Buckwalter to forego such a trial strategy in light of the evaluation he received from Dr. French. We therefore conclude that Buckwalter was not deficient in his failure to prepare and present a mental defense during the guilt phase.[24]

### 2. Failure to challenge Thomas's testimony

■ In addition, Silva claims that Buckwalter was ineffective in failing adequately to prepare for and challenge Thomas's testimony at trial. In particular, Silva contends that Buckwalter was deficient in failing to challenge the prosecution's proffer of a hearsay statement that was allegedly adopted by Silva and tantamount to a confession of Thorpe's murder. As described earlier, Thomas's testimony that Silva "smiled" upon overhearing Shelton's account of Thorpe's death while the three were standing at the burn barrel was received into evidence at Silva's trial as an adoptive admission. The California Su-

**24.** Furthermore, even assuming, *arguendo*, that Buckwalter's performance was constitutionally deficient as alleged, we cannot conclude that it was prejudicial, in the sense that but for these alleged deficiencies there is a "reasonable probability" that the jury would have either acquitted Silva or convicted him of a lesser offense. Although it is certainly plausible that Silva lacked the requisite mens rea for a first-degree murder conviction, given the possibility that he was suffering from a variety of mental disorders and drug-induced withdrawal symptoms at the time of the crimes, this is still a few steps removed, in our opinion, from a "reasonable probability" that the jury would not have found him guilty of a death-eligible offense. Tellingly, although he is able to conclude that Silva suffers from a variety of neurological, psychiatric, and social adjustment disorders, Silva's own psychiatric expert for habeas, Dr. Jack-

man, cannot himself express a definitive conclusion that Silva was incapable of forming "willful, deliberate, and premeditated" intent at the time of the crimes. Rather, Dr. Jackman states in his report that "[f]urther analysis and review will be required for me to formulate opinions bearing on the issue of whether Mr. Silva had the capacity to form the requisite mental states for the crimes and whether there is compelling evidence of mental impairment at the time of Mr. Silva's postcrime adoptive admissions that would affect their admissibility at trial." Accordingly, we believe that any conclusion about what a properly briefed expert might have testified at trial about Silva's ability to form "willful, deliberate, and premeditated" intent—not to mention the potential effect of such hypothetical testimony on the jury's deliberations—is overly speculative to merit granting relief.

preme Court upheld the admission of this evidence, as well as testimony about a similar "smile" Silva allegedly expressed during a separate porch conversation when Shelton recounted Craig's death to Thomas several days later.

Silva has always denied that he ever heard what Shelton was saying at the burn barrel. He and Shelton both introduced declarations in the district court to the effect that, if they had been called in a pretrial evidentiary hearing, they would have contradicted Thomas's testimony. At his own trial, Shelton also denied that the so-called adoptive admissions ever occurred.

In Silva's view, Buckwalter should have aggressively sought to impeach Thomas's testimony, given that "[p]etitioner's conviction rests squarely upon the testimony of Thomas, whose credibility was a central issue in the case." Silva specifically points to Buckwalter's failure to alert the jury to the fact that Thomas's motorcycle accident had left him comatose for 28 days with a fever as high as 106°, that he had a metal plate in his head, and that he was highly receptive to suggestion. According to Silva, had Buckwalter conducted a reasonably effective cross-examination, these facts could have been used to undermine Thomas's credibility as a witness.

The district court nonetheless found Buckwalter's performance to be reasonable and non-deficient in all of these respects. Referring to Buckwalter's deposition testimony, the court noted that he properly recognized that Thomas "was probably the most important prosecution witness" and was aware of Thomas's motorcycle accident and medical records. In the view of the district court, Buckwalter "made a reasonable tactical decision" not to cross-examine Thomas about the motorcycle accident because he thought it might generate sympathy for Thomas amongst the jurors.

Silva is correct that Thomas's credibility was critical, given the fact that he was the only witness who could finger Silva for Thorpe's murder. However, we ultimately agree with the district court that Buckwalter's handling of Thomas, based on his assessment of how Thomas came across to the jury at the time of the trial, represented a reasonable tactical decision. Indeed, our review of the record confirms that with the exception of the burn barrel and porch conversations, Buckwalter conducted a fairly thorough cross-examination of Thomas with respect to other events surrounding the murders. As a result, he was able to elicit admissions from Thomas that Silva had never actually told him to dismember Thorpe's body, that Silva had never threatened him regarding his testimony, and that Shelton had warned him to "put all the blame on Ben." He also elicited Thomas's statement that Laura Craig had "come on to him" on the morning of Thorpe's murder and that his sexual intercourse with her was consensual. Furthermore, the district attorney effectively preempted any defense exploitation of the motorcycle accident by raising the issue during his direct examination of Thomas.

As a result, critical as it may have been, we cannot conclude that Buckwalter's cross-examination of Thomas was constitutionally deficient. Put another way, although Buckwalter's decision not to cross-examine Thomas more forcefully about Silva's adoptive admissions or the accident may seem ill-advised in retrospect, his explanation does not appear so unreasonable when viewed at the time of the trial as to violate *Strickland*'s minimum standard of competence.

Most importantly, Buckwalter secured an acquittal on one of the two murder charges Silva faced: the death of Laura

Craig. In light of the overwhelming evidence presented by the state of Silva's general involvement in the crimes—including physical evidence, weaponry, and other witness testimony placing Silva at the gas station and at Shelton's ranch—this result militates strongly in favor of finding that counsel's overall performance was adequate during the guilt phase. In sum, we conclude that Buckwalter was not deficient in his handling of Thomas's testimony.

## VII.

Finally, Silva argues that the district court abused its discretion in denying an evidentiary hearing on his claim that the prosecution improperly failed to disclose an important component of a deal they struck with Thomas, to the effect that he would not be psychiatrically examined until after he testified in Silva's trial. In support of this claim, Silva offers a declaration from Thomas's attorney stating that he believed his brain-damaged client was either incompetent to stand trial or insane, and that he had immediate plans to have Thomas psychiatrically examined before striking the deal with the prosecution. This aspect of the alleged agreement was never divulged to Buckwalter or the trial judge, nor was it revealed by Thomas in his testimony before the jury. Such prosecutorial misconduct, according to Silva, amounted to the suppression of potentially exculpatory material which could have been used to impeach Thomas's testimony, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny.

■ Under pre-AEDPA law, which applies to this claim, "[a] habeas petitioner is entitled to an evidentiary hearing as a matter of right on a claim where the facts are disputed if two conditions are met: (1) the petitioner's allegations would, if proved, entitle him to relief; and (2) the

state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts." *Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir.1997). Silva did not receive a hearing on his *Brady* claims in state court. Thus, the only question is whether his *Brady* claim, if proved, would entitle him to relief.

Under *Brady*, "[t]o reverse under the stricter standard for materiality, we must find that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding *would* have been different.'" *United States v. Steinberg*, 99 F.3d 1486, 1491 (9th Cir.1996) (citation omitted). "A 'reasonable probability' of a different result is [ ] shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Steinberg*, 99 F.3d at 1491 (internal quotations and citation omitted, alteration in original). Thus, to justify an evidentiary hearing on the *Brady* claim, Silva needed to make a threshold showing "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (citation omitted).

■ The district court declined Silva's request for discovery on this matter, reasoning that any "evidence indicating that Thomas may have had faulty recollection and was prone to adopting as his own the suggestions of others is not direct evidence of Petitioner's innocence," and thus did not violate the dictates of *Brady* or *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The district court further reasoned that even if the prosecutor ought to have disclosed the terms of the bargain, Silva could not have forced Thomas to undergo a psychiatric evaluation anyway, and Buckwalter would therefore only have been able to attack

Thomas on cross-examination as he did at trial.

Silva responds that he would have materially benefited from disclosure of the deal, either from the jury's knowledge that even the prosecution doubted Thomas's competency, or from any reports resulting from an actual psychiatric evaluation. Particularly in light of the centrality of Thomas's testimony, such non-disclosed arguably amounted to the withholding of material exculpatory evidence under *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (holding that "the showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal"; rather, *"Bagley*'s touchstone of materiality is a 'reasonable probability' of a different result .... [such that] the Government's evidentiary suppression 'undermines confidence in the outcome of the trial' ") (citations omitted).

"We cannot overemphasize the importance of allowing a full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case." *United States v. Brooke*, 4 F.3d 1480, 1489 (9th Cir.1993). Our cases confirm that the suppression of material impeachment evidence, particularly for key state witnesses, may require the reversal of a conviction or the vacating of a sentence. For example, in *United States v. Brumel–Alvarez*, 991 F.2d 1452 (9th Cir.1993), we found that the government's withholding of a memorandum highly critical of the role and integrity of a key government informant during the course of an undercover drug investigation violated the defendants' due process rights under *Brady*. *See also Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir.1997) (en banc) (holding that the "need for disclosure is particularly acute" with informant witnesses who have made agreements with the government); *United States v. Steinberg*, 99 F.3d at 1491–92 (finding *Brady* violation where government failed to disclose impeachment information regarding criminal activity of key confidential informant).

Similarly, in *United States v. Mejia–Mesa*, 153 F.3d 925 (9th Cir.1998), we held that the district court had abused its discretion in denying an evidentiary hearing on a habeas petitioner's *Brady* claim. The petitioner, who was convicted of importing cocaine into the country, contended that pages removed from the deck log of a vessel alleged to be carrying the cocaine would demonstrate that the vessel was outside of U.S. waters on the date of the offenses. *Id.* at 927. We concluded that "[i]f Mejia–Mesa's allegations are true, the missing page or pages would be exculpatory evidence." *Id.* at 929; *but cf. Wood v. Bartholomew*, 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (finding that the state's failure to disclose that a key witness had failed a lie detector test did not create a reasonable probability of a different trial outcome, since Washington state evidence law precluded the introduction of polygraph evidence at trial); *United States v. Bracy*, 67 F.3d 1421 (9th Cir.1995) (finding no *Brady* violation where the evidence tended to show that the government had not suppressed evidence about the criminal background of a key witness).

In light of these cases, we hold that the district court abused its discretion in denying an evidentiary hearing on Silva's claim of prosecutorial misconduct. We reach this conclusion for three principal reasons. First, as discussed in connection with his guilt-phase ineffectiveness claims, Thomas's credibility was a critical issue, given that he was the only witness who could

identify Silva as the trigger man in Thorpe's murder. Second, Silva's argument is not predicated on a claim of actual innocence, but instead on the contention that the jury would not have convicted him of a death-eligible offense. The district court's reasoning—that the claim was meritless because Silva himself lacked the ability to compel an examination of Thomas, and that even if an examination had been conducted, any resulting evidence of Thomas's mental deficiencies would not have been "direct evidence of Petitioner's innocence"—therefore plainly misapprehends the nature of Silva's claim. For even if the defense could not have compelled Thomas to undergo a psychiatric examination, the very fact that the prosecution struck such a deal (if true as alleged) could by itself have undermined Thomas's credibility before a jury. Put another way, the jury would have been made aware of the potentially devastating fact that the state itself doubted Thomas's mental competency.[25]

Finally, the district court's assumption that evidence has to be directly demonstrative of a defendant's innocence in order to be subject to disclosure under *Giglio*, *Bagley*, and *Kyles*, was legally erroneous, since material impeachment evidence of a key state witness is equally subject to the disclosure requirements of *Brady*.

In light of Silva's pleadings, as supported by the declaration from Thomas's attorney, we therefore hold that Silva presents a claim that, if proved through an evidentiary hearing, would meet the *Brady* materiality standard. Accordingly, the district court abused its discretion in denying an evidentiary hearing on this matter. *See Campbell*, 18 F.3d at 679 ("In habeas corpus proceedings, an evidentiary hearing is required where the petitioner's allegations, if proved, would establish the right to relief.").

## CONCLUSION

Silva's trial counsel was constitutionally ineffective in failing to investigate Silva's background and present potentially compelling mitigating evidence during the penalty phase of his trial. Silva's directive to Buckwalter did not justify trial counsel's decision to altogether abandon investigation. In order to be able to make a sufficiently informed decision about trial strategy, Buckwalter had a duty to seek out all available sources of mitigating evidence, including contacting family members even if they would not be called upon to testify. In addition, Buckwalter was deficient in failing to inform Silva about the consequences of not investigating. As a result, we grant the writ with respect to Silva's death sentence and remand for a new sentencing hearing.

Nonetheless, for the reasons we have articulated, we hold that Buckwalter's performance was not constitutionally deficient during the guilt phase of the trial.

However, we hold that the district court abused its discretion in failing to permit discovery and conduct an evidentiary hearing on the question of whether the prosecutor suppressed an important aspect of the "deal" he allegedly struck with Norman Thomas. If true as alleged, such nondisclosed may have amounted to a material *Brady* violation. We accordingly remand to the district court for an evidentiary hearing on this matter.

---

**25.** As discussed earlier, whatever doubts the jury may have entertained about Silva's culpability as a result of the undermining of Thomas's credibility may also have affected their assessment of the appropriate penalty to impose. *See Hendricks*, 70 F.3d 1032, 1043 (9th Cir.1995); *cf. Williams*, 529 U.S. at 398, 120 S.Ct. 1495.

AFFIRMED IN PART, REVERSED IN PART; PETITION GRANTED AS TO SENTENCE AND REMANDED TO DISTRICT COURT WITH INSTRUCTIONS TO REMAND FOR NEW STATE COURT SENTENCING HEARING AFTER PETITIONER HAS EXHAUSTED HIS PRESENT FEDERAL HABEAS PETITION; REMANDED TO DISTRICT COURT FOR EVIDENTIARY HEARING; STAY GRANTED ON DISTRICT COURT'S REMAND TO STATE COURT UNTIL PETITIONER HAS EXHAUSTED HIS FEDERAL HABEAS PETITION.